Marquiz Law Office
Professional Corporation

3088 Via Flaminia Court
Henderson, NV 89052
Phone: (702) 263-5533
Fax: (702) 263-5532
Craig A. Marquiz, Esq.
NV Bar #7437
MarquizLaw@cox.net

Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JOSEPH O'SHAUGHNESSY, individually; MEL BUNDY, individually; JASON D. WOODS, individually; DAVE BUNDY, individually; MARYLYNN BUNDY, individually; BRIANA BUNDY, individually; BRETT ROY BUNDY, individually; MAYSA LYNN BUNDY, individually; DALLY ANNE BUNDY, individually; BRONCO CLIVEN BUNDY, individually; PAYTON ALMA BUNDY, individually; PIPER BODEL BUNDY, individually; MONTANA BUNDY, individually; BENTLIE BUNDY, individually; PRESLY BUNDY, individually; KYMBER BUNDY, individually; and ADAHLEN BUNDY, individually, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; DOES 1 through 100; and ROES 1 through 100, inclusive, <br><br> Defendants. | Case No.:      2:20-cv-00268 <br><br><br> **MOTION FOR LEAVE OF COURT TO FILE SECOND AMENDED COMPLAINT** |

Plaintiffs Joseph O'Shaughnessy, Mel Bundy, Jason D. Woods, Dave Bundy, Marylynn

Bundy, Briana Bundy, Brett Roy Bundy and the Bundy minor children (Maysa Lynn Bundy,

Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana

Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy), by and through

1   their undersigned counsel of record, Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C.,

2   respectfully submit their Motion for Leave to file a Second Amended Complaint in this matter.

3   In this regard, Plaintiffs' request should be granted in the interests of justice, fairness and equity

4   pursuant to, without limitation, Fed.R.Civ.P. 15(a) and this Court's Order dated January 6, 2022

5   (ECF No. 67).

6       Plaintiffs' Motion is supported by the accompanying Memorandum of Points and

7   Authorities, the record herein and any oral argument that may be received on Plaintiffs' Motion.

8   Further, in accordance with Fed.R.Civ.P. 15, a copy of Plaintiffs' proposed Second Amended

9   Complaint against the United States of America is attached hereto as Exhibit 1.[1]

10      RESPECTFULLY SUBMITTED this 5th day of February, 2022.

11

12  Marquiz Law Office
    Professional Corporation

13

14  By: /s/ Craig A. Marquiz, Esq.
    Craig A. Marquiz, Esq.

15  3088 Via Flaminia Court
    Henderson, NV 89052

16  Counsel for Plaintiffs

17

18  . . .

19  . . .

20  . . .

21  . . .

22

23  [1]    As the Court will note, Plaintiffs' proposed Second Amended Complaint contains

24  a single cause of action against Defendant the United States (i.e., Plaintiffs' FTCA claims); the proposed new caption (i.e., to reflect Plaintiffs' assertion of FTCA claims against the United

25  States only) has been identified; allegations regarding Plaintiffs' former 42 U.S.C. § 1983, *Bivens* and declaratory relief claims have been removed; new averments and/or changes from Plaintiffs'

26  prior pleading are identified in bold and italicized writing; and the former individually-named defendants (previously identified collectively as "GOVERNMENT DEFENDANTS" are now

27  referenced collectively as the "GOVERNMENT EMPLOYEES" to signify their status as federal employees acting in their official capacities and within the scope and course of their employment

28  with the United States and its applicable federal agencies.

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     Introduction**

On February 6, 2020, attorney C. Benjamin Scroggins filed the underlying lawsuit on behalf of Plaintiffs (ECF No. 1).  On April 29, 2020, attorneys Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C. and Bret O. Whipple, Esq. were substituted-in as counsel of record for Plaintiffs in this matter (ECF No. 7) and, on May 20, 2020, Plaintiffs filed their First Amended Complaint (ECF No. 11) against Defendants:  the United States of America ("United States"); Assistant United States Attorneys ("AUSA's) Nadia Ahmed ("Ahmed"), Steven Myhre ("Myhre") and Daniel Bogden ("Bogden"); Bureau of Land Management Special Agent in Charge ("BLM SAC") Daniel P. Love ("Love"), and Officers Mark Brunk ("Brunk") and Rand Stover ("Stover"); and Federal Bureau of Investigation ("FBI") Agent Joel Willis ("Willis").  In their First Amended Complaint, Plaintiffs asserted four affirmative claims for relief:  (1) a deprivation of civil rights claim under 42 U.S.C. § 1983; (2) deprivation of constitutional and civil rights claims under *Bivens*;[2] (3) claims for declaratory relief under 42 U.S.C. § 1988 and 28 U.S.C. § 2202; and (4) Federal Tort Claims Act Claims under 28 U.S.C. § 2671 *et seq*.[3]

On September 22, 2020, Defendants the United States, Ahmed, Myhre, Bogden, Brunk, Stover and Willis moved to dismiss Plaintiffs' First Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6). *See* Motion to Dismiss (ECF No. 44).  That same day, Defendant Love filed a Joinder thereto. *See* Joinder (ECF No. 46).  On November 12, 2020, Plaintiffs filed their Consolidated Opposition thereto (ECF No. 52) and, on December 23, 2020, all Defendants filed their Consolidated Reply brief (ECF No. 56).  The Court heard oral argument regarding same on November 19, 2021 and issued its Order on January 6, 2022 (ECF No. 67).

In its Order, the Court granted Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("FAC") "without prejudice and with leave to file a motion for leave to amend ...

---

[2]      *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[3]      Specifically, claims for (a) false arrest, (b) false imprisonment, (c) malicious prosecution, (d) intentional infliction of emotional distress and (e) loss of consortium.

1  within thirty (30) days from the date of [that] Order. *See* Order (ECF No.67) at 16:09-12.[4]  With

2  regard to Plaintiffs' Fourth Claim for Relief (i.e., Plaintiffs' FTCA claims), the Court noted that

3  additional facts were necessary for the Court to conclude that it has subject matter jurisdiction

4  over that claim.

5  　　　　In accordance with the Court's Order, Plaintiffs respectfully submit their Motion for Leave

6  to Amend their pleading and file a Second Amended Complaint in this action against the United

7  States only with regard to Plaintiffs' FTCA claims.  As detailed below, at this juncture, since

8  Plaintiffs have fully complied with the filing requisites to initiate such a claim (i.e., having

9  previously served the United States and implicated federal agencies, including, without limitation,

10 the FTCA section of the Department of Justice with an administrative demand package; the

11 Department of Justice having acknowledged receipt of all such materials by February 6, 2020; and

12 the six month response period having lapsed), this Court possesses exclusive subject matter

13 jurisdiction over Plaintiffs' FTCA claims as a matter of law.  Consequently, Plaintiffs' Motion for

14 Leave to Amend should be granted and Plaintiffs' permitted to proceed with their FTCA claims

15 against the United States in the interests of justice, equity and fairness.

16 **II.**　　**<u>Leave to Amend is Appropriate</u>**

17 　　　　"Leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).  "In

18 the absence of any apparent or declared reason - such as undue delay, bad faith or dilatory motive

19 on the part of the movant, repeated failure to cure deficiencies by amendments previously

20

21 ──────────────

22 　　　　[4]　　　With regard to Plaintiffs' First, Second and Third Claims for Relief, the Court
noted in its Order that Plaintiffs' First Amended Complaint failed to connect or otherwise link

23 any specific factual allegations against the individually-named defendants to support an inference
that said Defendants violated any of the aforementioned claims.  As detailed in Plaintiffs'

24 Consolidated Opposition to Defendants' Motion to Dismiss and Joinder (ECF No. 52), Plaintiffs
affirmatively alleged said Defendants' personal participation in the performance of specific

25 unconstitutional acts and/or the direction of others to do so (i.e., factual averments detailing each
Defendant's purposeful violation and impairment of Plaintiffs' Constitutional rights) via "group

26 pleading." *Id.* at 13:06 to 15:11; *see also* FNs 19-22.  Notably, since the specific information
regarding each Defendant's specific conduct remains in the custody, possession and control of

27 the individually-named Defendants and the United States, without discovery, Plaintiffs are
unable at this juncture to provide any additional facts in support of those claims.  Should specific

28 facts become available during the course of discovery in this action, Plaintiffs' will revisit the
appropriateness of re-asserting said claims at a later date.

1  allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

2  of the amendment, etc. - the leave sough should, as the rules require, be 'freely given.'" *Foman v.*

3  *Davis*, 371 U.S. 178, 182 (1962). Notably, "the purpose of pleading is to facilitate a proper

4  decision on the merits." *Id.* at 181-82 (*quoting Conley v. Gibson*, 355 U.S. 41, 48 (1957)). The

5  strong policy permitting amendment is to be applied with "extreme liberality." *Eminence Capital,*

6  *LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (*quoting Owens v. Kaiser Found.*

7  *Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).

8        The underlying factual record here unequivocally confirms that leave to amend must be

9  afforded in the interests of justice, equity and fairness. Notably, as detailed in BLM Special Agent

10  Larry Wooten's Whistleblower Complaint (detailed in Plaintiffs proposed Second Amended

11  Complaint, Exhibit 1 hereto, at ¶¶ 121, 122.A-R) and former Chief District Court Judge Navarro's

12  Order from the January 8, 2018 Tier 1 Motion to Dismiss Hearing (*Id.*, at ¶¶ 124 - 125, 126.A-

13  BB) numerous *Brady* violations were revealed, including, without limitation, extensive

14  exculpatory evidence regarding the Tier 2 Plaintiffs that had been knowingly, intentionally and

15  willfully withheld by the UNITED STATES and AUSA's Ahmed, Myhre and Bogden.

16  Specifically:

17     G.   "Here in this case, both the prosecution and the investigative agencies are equally
            responsible for the failure to produce *Brady* materials to the defense." *See*
18          January 8, 2018 Hearing Transcript at 10:04-06.

19     H.   The Court finds the prosecution's representations that it was unaware of the
            materiality of the Brady evidence is grossly shocking." Transcript at 10:13-15.
20
21     I.   "[T]he government was well aware that theories of self-defense, provocation and
            intimidation might become relevant if the defense could provide a sufficient offer
            of proof to the Court. However, the prosecution denied the defense its opportunity
22          to provide favorable evidence to support their theories as a result of the
            government's withholding of evidence and this amounts to a *Brady* violation."
23          Transcript at 10:22 to 11:11.

24     J.   "[T]he prosecutor has a duty to learn of favorable evidence known to other
            government agents, including the police, if those persons were involved in the
25          investigation or prosecution of the case." Transcript at 11:07–11 (*citing Kyles v.
            Whitley*, 514 U.S. 419 (1995).
26
       K.   "Clearly, the FBI was involved in the prosecution of this case." Transcript at 11:12.
27
       L.   "Based on the prosecution's failure to look for evidence outside of that provided by
28          the FBI and the FBI's failure to provide evidence that is potentially exculpatory to

the prosecution for discovery purposes, the Court finds that a universal sense of justice has been violated." Transcript at 11:13–17.

V.   "'The prosecutor has a 'sworn duty' to assure that the defendant has a fair and impartial trial.  His interest in a particular case is not necessarily to win, but to do justice.'" Transcript at 15:14-17 (*quoting U.S. v. Chapman*." 524 F.3d 1073 (9th Cir. 2008)).

W.   "[T]he fact that the prosecution failed to look beyond the files provided by the FBI is not mere negligence; it is a reckless disregard for its Constitution[al] obligations to learn and seek out favorable evidence.  The prosecution's reliance on the FBI to provide the required information *amounted to an intentional abdication of its responsibility*." Transcript at 16:11-16 (Emphasis Added).

X.   "Thus, the Court does find that there has been flagrant prosecutorial misconduct in this case ...." Transcript at 19:09-10.

Y.   "The Court is troubled by the prosecution's failure to look beyond the FBI file that was provided and construes the Brady violations in concert as a reckless disregard of its discovery obligations.  The government's recklessness and the prejudice the defendants will suffer as a result of a retrial warrant the extreme measure of dismissing the Indictment because no lesser sanction would adequately ... deter future investigatory and prosecutorial misconduct." Transcript at 20:14-21.

Z.   "[The government's] conduct has caused the integrity of a future trial and any resulting conviction to be even more questionable.  Both the defense and the community possess the right to expect a fair process with a reliable conclusion.  Therefore, it is the Court's position that none of the alternative sanctions available are as certain to impress the government with the Court's resoluteness in holding prosecutors and their investigative agencies to the ethical standards which regulate the legal profession as a whole." Transcript at 20:23 to 21:07.

AA.   "***The Court finds that the government's conduct in this case was indeed outrageous, amounting to a due process violation***, and that a new trial is not an adequate sanction for this due process violation." Transcript at 21:08-11 (Emphasis Added).

BB.   "Even if the government's conduct did not rise to the level of a due process violation, the Court would nonetheless dismiss under its supervisory powers because ***there has been flagrant misconduct, substantial prejudice, and no lesser remedy is sufficient ... Number one, to properly remedy the constitutional violation; number two, to protect judicial integrity by ensuring that a conviction rests only on appropriate considerations validly before a jury; and number three, to deter future illegal conduct***." Transcript at 21:12-16, 21:20-24 (Emphasis Added).

Importantly, as a direct, proximate and foreseeable cause of the GOVERNMENT EMPLOYEES' egregious conduct (conduct performed by these federal employees while acting in their official capacities and within the scope and course of their employment):  (a) the Tier 2 Plaintiffs (i.e., Joseph O'Shaughnessy, Mel Bundy, Dave Bundy and Jason Woods) were falsely arrested; (b) wrongfully denied bail; (c) unlawfully detained, imprisoned and monitored for

6

1  twenty-three (23) months; (d) wrongfully separated from their friends, family and loved ones,

2  including, without limitation the Bundy Family Plaintiffs, and the forced to endure stress and

3  mental, physical and emotional anguish (which Plaintiffs continue to experience); (e) they lost the

4  care, companionship and comfort of their loved ones; (f) they were prohibited from freely

5  practicing their faith and attending weekly family worship services / other church events – tenants

6  of the LDS faith; (g) they have been plagued by financial, occupational and reputational harm as a

7  result of the Government Employees' egregious branding and characterization of them in the

8  media as "domestic terrorists;" (h) they have lost gainful employment, including, without

9  limitation, future impairment for Plaintiffs' chosen professions; (I) they have been harassed and

10  embarrassed due to the Government Employees' placement and continued maintenance of

11  Plaintiffs on the "No Fly List" (which results in improper detainment, interrogation, delays and

12  other travel restrictions when they attempt to fly commercially); and (j) their rights to lawfully

13  acquire and bear arms has been interfered with due to the Government Employees placement of

14  Plaintiffs on secret lists which disqualifies and precludes them from purchasing firearms.  Thus,

15  for purposes of 28 U.S.C. § 1346(b), Plaintiffs' have alleged injuries for which redress / monetary

16  damages under the FTCA is appropriate.

17  **III.**     **All FTCA Administrative Remedies / Requirements Have Been Exhausted**

18          Pursuant to 28 U.S.C. § 1346(b), "federal district courts have jurisdiction over a certain

19  category of claims for which the [United States] has waived its sovereign immunity and

20  'render[ed]' itself liable," including, without limitation, "claims that are: [1] against the United

21  States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death

22  [4] caused by the negligent or wrongful act or omission of any employee of the Government

23  [5] while acting in the scope of his office or employment, [6] under circumstances where the

24  United States, if a private person, would be liable to the claimant in accordance with the law of

25  the place where the act or omission occurred." *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994)

26  (*quoting* 28 U.S.C. § 1346(b)).  "A claim comes within this jurisdictional grant – and thus is

27  'cognizable' under § 1346(b) – if it is actionable under § 1346(b)[;] [a]nd a claim is actionable

28  under § 1346(b) if it alleges the six elements outlined above," *Id.* (*citing Loeffler v. Frank*, 486

1  U.S. 549 (1988)).  The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, is the

2  exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against

3  Federal employees who commit torts while acting within the scope and course of their

4  employment (28 U.S.C. § 2679(b)(1)); *see also United States v. Orleans*, 425 U.S. 807, 813

5  (1976).

6        As the Government previously conceded, Plaintiffs filed their Administrative Claim with

7  the United States on February 3, 2020. Motion to Dismiss (ECF No. 44) at 40, n. 23.  The United

8  States, having failed to respond thereto within six months, was deemed to have finally denied that

9  claim on August 3, 2020.[5] 28 U.S.C. § 2675(a) ("The failure of an agency to make final

10  disposition of a claim within six months after it is filed shall, at the option of the claimant any

11  time thereafter, be deemed a final denial of the claim for purposes of this section."); *see also*

12  Motion to Dismiss (ECF No. 44) at 41:3.

13        Consequently, at this juncture, Plaintiffs' have exhausted their administrative remedies

14  with respect to their FTCA claims and, as a result, their submission of same via Plaintiffs' Motion

15  for Leave to Amend and accompanying proposed Second Amended Complaint (Exhibit 1 hereto)

16  unequivocally provides the Court with the requested inference that said claims are

17  administratively exhausted and, thus, properly before the Court for subject matter jurisdictional

18  purposes.

19  **IV.**  **Conclusion**

20        Based upon the foregoing, Plaintiffs respectfully request that their Motion for Leave to

21  Amend be granted and that they be permitted to proceed with their FTCA claims against the

22  United States as detailed in their proposed Second Amended Complaint.  In particular, since

23  Plaintiffs have fully exhausted their administrative remedies (i.e., having properly and validly

24  served the United States and its requisite agencies with an administrative demand packet; the

25

26                                   

27        [5]     As detailed above, the United States previously confirmed that all administrative demand packets had been received by February 6, 2020.  Consequently, even if the Court were to accept the Department of Justice's February 6, 2020 "receipt" date for purposes of the exhaustion

28  analysis, the United States denial of Plaintiffs' FTCA claim occurred no later than August 5, 2020.

8

1    United States having failed to respond thereto within six (6) months; and Plaintiffs' having set

2    forth additional factual averments which unequivocally confirm, at this juncture, an inference that

3    said claims were administratively exhausted), the Court, irrefutably possesses exclusive subject

4    matter jurisdiction over same as a matter of law.  Consequently, permitting Plaintiffs' proposed

5    Amendment is appropriate and such recognition will further the express mandate of Rule 1,

6    Fed.R.Civ.P. (i.e., to construe, administer and employ the Federal Rules of Civil Procedure to

7    "secure the just, speedy, and inexpensive determination of every action and proceeding)."

8            RESPECTFULLY SUBMITTED this 5th day of February, 2022.

9                                                          ◆
                                                    Marquiz Law Office
10                                                Professional Corporation
                                                          ◆
11
                                           By: /s/ Craig A. Marquiz, Esq.
12                                             Craig A. Marquiz, Esq.
                                               3088 Via Flaminia Court
13                                             Henderson, NV 89052

14

15                                  **CERTIFICATE OF SERVICE**

16

17           The undersigned hereby certifies that, on this 5th day of February, 2022, he electronically
18    filed Plaintiffs' Motion for Leave with the Clerk of the Court with a copy of same electronically
19    served upon all counsel of record:
20

21                                           Craig A. Marquiz, Esq.
                                             Craig A. Marquiz, Esq.
22

23

24

25

26

27

28

**Exhibit 1**

1

2

◆

Marquiz Law Office

Professional Corporation

◆

3     3088 Via Flaminia Court
      Henderson, NV 89052
4     Phone: (702) 263-5533
      Fax: (702) 263-5532
5     Craig A. Marquiz, Esq.
      NV Bar #7437
6     MarquizLaw@cox.net

7     Attorney for Plaintiff

8

9                 **UNITED STATES DISTRICT COURT**

10                    **DISTRICT OF NEVADA**

11    JOSEPH O'SHAUGHNESSY, individually;      Case No.:      2:20-cv-00268
      MEL BUNDY, individually; JASON D.
12    WOODS, individually; DAVE BUNDY,
      individually; MARYLYNN BUNDY,
13    individually; BRIANA BUNDY, individually;
      BRETT ROY BUNDY, individually; MAYSA      ***SECOND* AMENDED COMPLAINT**
14    LYNN BUNDY, individually; DALLY ANNE
      BUNDY, individually; BRONCO CLIVEN
15    BUNDY, individually; PAYTON ALMA
      BUNDY, individually; PIPER BODEL
16    BUNDY, individually; MONTANA BUNDY,
      individually; BENTLIE BUNDY, individually;
17    PRESLY BUNDY, individually; KYMBER
      BUNDY, individually; and ADAHLEN
18    BUNDY, individually,

19                            Plaintiffs,

20    v.

21    UNITED STATES OF AMERICA; DOES
      1 through 100; and ROES 1 through 100,
22    inclusive,

23                            Defendants.

24
              Plaintiffs Joseph O'Shaughnessy, Mel Bundy, Jason D. Woods, Dave Bundy, Marylynn
25
      Bundy, Briana Bundy, Brett Roy Bundy and the Bundy minor children (Maysa Lynn Bundy,
26
      Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana
27
      Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy), through undersigned
28

counsel, Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C., and for their claims against Defendant the United States of America ("UNITED STATES"), aver and allege as follows:

## JURISDICTION & VENUE

1.      This Court possesses original subject matter jurisdiction over Plaintiffs' affirmative claims for relief pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), including, without limitation, exclusive jurisdiction of Plaintiffs' 28 U.S.C. § 1346 Federal Tort Claims Act ("FTCA") claims against the United States due to the negligent, wrongful acts and/or omissions of *several* federal employees who, while acting in the course and scope of their employment with their respective federal agencies, caused acts and events to occur within this forum under circumstances where the United States, if a private person, would be liable to Plaintiffs as detailed in 28 U.S.C. § 2674 and the laws of the State of Nevada where the ***Defendant's*** acts or omissions occurred.

2.      Venue of this matter is properly before this Court pursuant to 28 U.S.C. § 1391 as the underlying action and corresponding damages occurred within this District ***and*** the United States is a named Defendant.

## PARTIES

3.      Plaintiff Joseph O'Shaughnessy ("O'Shaughnessy") is, and at all times was, an Arizona domiciliary and citizen of the United States.

4.      Plaintiff Jason D. Woods ("Woods") is, and at all material times was, an Arizona domiciliary and citizen of the United States.

5.      Plaintiff Dave Bundy ("Dave Bundy") is, and at all material times was, a Utah domiciliary and citizen of the United States; married to Plaintiff Marylynn Bundy; and the father of Plaintiffs Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy.

6.      Plaintiff Mel Bundy ("Mel Bundy") is, and at all material times was, a Nevada domiciliary and citizen of the United States; married to Plaintiff Briana Bundy; and the father of Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy.

1       7.    Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy shall hereinafter

2   be referred collectively to as the "Tier 2 Plaintiffs" for their wrongful status as criminal

3   defendants in an egregious, fabricated and sham proceeding advanced by the ***UNITED STATES***

4   ***and its employees*** in the United States District Court for the District of Nevada in *United States*

5   *v. Bundy et al.*, Case No. 2:16-cr-00046-GMN-PAL ("Underlying Action").[1] Notably, in the

6   Underlying Action, the UNITED STATES spent hundreds of millions of dollars in a multi-state

7   effort to falsely convict Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy of

8   fabricated crimes purportedly dating back to 2014 and, to that end, forced Plaintiffs

9   O'Shaughnessy, Woods, Dave Bundy and Mel Bundy to wrongfully endure twenty-three (23)

10  months of incarceration and monitoring, mostly at a sweltering federal-contractor prison in

11  Pahrump, Nevada.  During that time, Plaintiffs suffered severe emotional, physical, mental,

12  occupational and financial distress – damages and injuries which continue to this day.

13      8.    Plaintiff Marylynn Bundy is, and at all material times was, a Utah domiciliary

14  and citizen of the United States; married to Plaintiff Dave Bundy; and the mother of Plaintiffs

15  Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma

16  Bundy and Piper Bodel Bundy.

17      9.    Plaintiff Briana Bundy is, and at all material times was, a Nevada domiciliary and

18  citizen of the United States; married to Plaintiff Mel Bundy; and the mother of Plaintiffs

19  Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy.

20  . . .

21  . . .

22  

23      [1]    In the Underlying Action, nineteen (19) Bundy defendants, including, without

24  limitation, Plaintiffs O'Shaughnessy, Woods, Dave Bundy and Mel Bundy, were separated into
    three (3) distinct trial groups; namely, the "Tier 1" (the alleged "leadership" defendants); "Tier 2"

25  (the claimed "mid-level leadership" defendants); and "Tier 3" (the alleged "gunmen") groups.
    Due to prosecutorial misconduct, including, without limitation, the intentional suppression of

26  exculpatory evidence confirming, among other things, the innocence of the Tier 2 Plaintiffs,
    along with the government's knowing and intentional use of fabricated evidence to secure

27  indictments against them, the first and only trial of the Tier 1 defendants was dismissed in
    January 2018.  Shortly thereafter, all charges against the Tier 2 group were dismissed based upon

28  the United States own motion to dismiss their Superseding Indictments with prejudice.

10.     Plaintiff Brett Roy Bundy is, and at all material times was, a Utah domiciliary and citizen of the United States; and the oldest child, an adult son, of Plaintiffs Dave Bundy and Marylynn Bundy.

11.     Plaintiffs Maysa Lynn Bundy and Dally Anne Bundy are, and at all material times were, Utah domiciliaries and citizens of the United States; and the minor daughters of Plaintiffs Dave Bundy and Marylynn Bundy.

12.     Plaintiffs Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy are, and at all material times were, Utah domiciliaries and citizens of the United States; and the minor sons of Plaintiffs Dave Bundy and Marylynn Bundy.

13.     Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy are, and at all material times were, a Nevada domiciliaries and citizens of the United States; and the minor daughters of Plaintiffs Mel Bundy and Briana Bundy.

14.     Plaintiffs Marylynn Bundy, Briana Bundy, Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy shall hereinafter be referred to collectively as the "Bundy Family Plaintiffs."

15.     The Tier 2 Plaintiffs and the Bundy Family Plaintiffs shall hereinafter be referred to collectively as "PLAINTIFFS."

*16.*     Defendant UNITED STATES is the federal government and, through it various agencies (e.g., the DOJ, FBI, DOI and BLM, described more specifically below) and employees (i.e., *Assistant United States Attorneys Nadia* Ahmed, *Steven* Myhre and *Daniel* Bogden, *Joel* Willis, *Daniel P.* Love, *Rand* Stover and *Mark* Brunk) - each of whom, for purposes of PLAINTIFFS" Federal Tort Claims Act ("FTCA") claims, was acting within his/her official capacity and within the scope and course of her/his employment with the applicable federal agency – caused acts and events to occur within this forum from which PLAINTIFFS' claims arose.

A.     The DOJ is, and at all material times was, an Executive Department and agency of Defendant UNITED STATES; responsible for the enforcement of law and the

1  administration of justice within the United States and doing business in this District; the

2  administrator of several law enforcement agencies, including, without limitation, the FBI; and the

3  employer of *Assistant United States Attorneys ("AUSAs") Nadia Ahmed, Steven Myhre and*

4  *Daniel Bogden (with Messrs. Myhre and Bogden, at certain times, each serving as the acting*

5  *U.S. Attorney for the District of Nevada)*.

6          B.    The FBI is, and at all material times was, the investigative arm of

7  Defendant UNITED STATES and DOJ; doing business in this District; and the employer of

8  *Special Agent Joel* Willis.

9          C.    The DOI is, and at all material times was, an Executive Department and

10  agency of Defendant UNITED STATES; responsible for the management and conservation of

11  federal lands and natural resources through the BLM (the employer of *Special Agent in Charge*

12  *of the BLM's Gold Butte Cattle Impoundment Operation ("SAC") Daniel P.* Love, *and*

13  *Officers Rand* Stover and *Mark* Brunk) with both agencies doing business in this District.

14      17.    *UNITED STATES employees* Ahmed, Myhre, Bogden, Willis, Love, Stover and

15  Brunk *(each of whom caused acts and events to occur within this forum while acting in the*

16  *scope and course of his/her employment with, and official capacities for, his/her respective*

17  *federal agencies)* shall hereinafter collectively be referred to as the "GOVERNMENT

18  *EMPLOYEES*."

19      18.    Upon information and belief, Defendants identified as DOES 1 through 100 and

20  ROES 1 through 100, whether individual, corporate, associate, governmental or otherwise,

21  caused acts and events to occur within this forum from which PLAINTIFFS' claims arose.  The

22  true names and capacities of these parties is not currently known by PLAINTIFFS, and once such

23  identities become known, PLAINTIFFS will seek leave of Court to amend their Complaint

24  accordingly.

25                          **STATEMENT OF THE CASE**

26      19.    PLAINTIFFS fully incorporate herein by reference all allegations contained in

27  paragraphs 1 through *18* of this Complaint.

28  . . .

5

1      20.     Since the early 1850's (many years before Nevada, as an unincorporated territory

2   of the United States, was admitted to the Union on October 31, 1864), ancestors of Plaintiffs

3   Dave Bundy, Mel Bundy and the Bundy Family (i.e., all members of the Church of Jesus Christ

4   of Later Day Saints, "LDS"),[2] migrated to this territory and the Gold Butte area in Clark County,

5   Nevada, ultimately securing deeds from the State of Nevada to land all along the Gold Butte

6   region.

7      21.     Upon that land, the Bundy family formed the Bundy Ranch as a living testimony

8   of their family history, work ethic, pride and patriotism - a legacy which serves as an integral part

9   of our American history and the development of the Great Basin region throughout the Western

10   United States.

11      22.     That legacy has been handed down from generation to generation with Plaintiffs

12   Dave Bundy and Mel Bundy learning same from their father, Cliven Bundy, and their own

13   hands-on experience working at the Bundy Ranch.

14      23.     Plaintiffs Dave Bundy and Mel Bundy, in turn, have honorably passed on that

15   same history, work ethic, pride and patriotism to their respective wives (Plaintiffs Marylynn

16   Bundy and Briana Bundy) and their children (Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne

17   Bundy, Bronco Cliven Bundy, Payton Alma Bundy, Piper Bodel Bundy, Montana Bundy, Bentlie

18   Bundy, Presly Bundy, Kymber Bundy and Adahlen Bundy).

19      24.     Over these generations, the Bundy family has invested their blood, sweat, tears

20   and considerable labor, materials and expense to improve the Bundy Ranch, including, without

21   limitation, developing numerous artesian springs / aquifers on the Gold Butte mountain range,

22   and securing title from the State of Nevada to the accompanying water rights.

23   . . .

24

25      [2]     Although the name "Mormon" has been used historically to refer to members of

26   the LDS faith, the name is actually a derogatory term – one first coined by former Missouri
   Governor Boggs in the 1800s during the persecution of early LDS Church leaders and in

27   furtherance of Governor Boggs Extermination Order.  That name, used repeatedly by the
   GOVERNMENT *EMPLOYEES*, is recognized as offensive by the LDS community and will be

28   used throughout this pleading when attributable to the GOVERNMENT *EMPLOYEES* as
   evidence of their animus toward PLAINTIFFS and the LDS community.

25.     Those springs, in turn, have served as a life force for the Bundy family's cattle that were lawfully grazing on the Bundy Ranch and its surrounding lands.

26.     Upon information and belief, as part of an egregious plan to eliminate ranching operations within the region, divest or otherwise acquire the private water rights held by those ranchers, including, without limitation, the Bundy family, and to sell-off or otherwise lease those rights for commercial development or other land-use purposes, the DOI / BLM sought to wage economic and financial warfare against the ranchers by imposing restrictive grazing permits and fees, and limiting the number of cattle that could graze upon those lands.

27.     To that end, in 1998, the UNITED STATES through the DOJ and AUSA's Ahmed and Bogden initiated a civil suit against Cliven Bundy in the United States District Court for the District of Nevada, Case No. 2:98-cv-00531, seeking monetary damages for his refusal to obtain BLM grazing permits and pay the corresponding fees.  That action , *United States v. Cliven Bundy*, resulted in a $1 million judgment in favor of the UNITED STATES - a majority of which constituted fines, penalties and interest.

28.     Armed with that judgment, the GOVERNMENT *EMPLOYEES* conspired together and orchestrated a fraudulent scheme to entice Cliven Bundy and his supporters, including, without limitation, Plaintiffs Dave Bundy, Mel Bundy, O'Shaughnessy and Woods, into an armed confrontation in April 2014 stemming from, among other things: the rounding-up and seizure of certain Bundy Ranch cattle, and staging of same in Bunkerville, Nevada; the egregious execution of other cattle from helicopters circling the Bundy Ranch and surrounding Gold Butte area; and their unauthorized destruction of various Bundy family spring sites.

29.     The round-up operation was intentionally and deliberately carried out, upon information and belief, at the specific direction of *GOVERNMENT EMPLOYEES* Ahmed, Myhre, Bogden, Love, Stover and Brunk in a brutal, violent and aggressive manner.

30.     Notably, upon information and belief, BLM SAC Love and Officer Stover determined that violent, aggressive, excessive and authoritarian tactics would force Cliven Bundy and his supporters (e.g., the Tier 2 Plaintiffs, the Bundy Family members and others) to react or . . .

7

1    otherwise respond physically, and thereby "justify" the GOVERNMENT *EMPLOYEES*'

2    planned "use of force in the Cattle Impoundment Operation.

3         31.    To that end, a whistleblower memorandum authored by BLM Special Agent

4    Larry Wooten in November 2017 expressly documented and memorialized *BLM SAC* Love's

5    stated intention to violently kick Cliven Bundy in the mouth as other BLM agents arrested him

6    and took him to the ground.

7         32.    The GOVERNMENT *EMPLOYEES*' Cattle Impoundment Operation and

8    resulting "standoff" proved to be an absolute disaster for the *UNITED STATES*; notably,

9    hundreds of protestors came out to support the Bundy family, express their anger for the federal

10    government's abuse of power, its usurpation of State's rights and the unconstitutional taking and

11    destruction of private property in violation of law.

12         33.    Although Plaintiffs Dave Bundy, Mel Bundy, O'Shaughnessy and Woods did not

13    engage in any wrongful conduct, they, nevertheless, were:  wrongfully arrested, detained,

14    imprisoned and in-custody for twenty-three (23) months, mostly in federally-contracted prisons,

15    including, without limitation, a prison in Pahrump, Nevada (i.e., before being summarily released

16    from custody based upon the UNITED STATES own pre-trial motion and judicially-determined

17    wrongdoings, including, without limitation, prosecutorial misconduct, the *UNITED STATES'*

18    knowing and intentional use of fabricated evidence to wrongfully arrest, detain and imprison the

19    Tier 2 Plaintiffs, and their knowing and intentional failure to disclose extensive exculpatory

20    evidence memorializing same); wrongfully separated from their families, friends and loved ones;

21    forced to endure the *UNITED STATES* rogue prosecution based upon on fabricated charges for

22    crimes they did not commit; and egregiously placed them and the Bundy Family on the "No Fly

23    List" along with precluding PLAINTIFFS from purchasing firearms based upon the

24    GOVERNMENT *EMPLOYEES*' designation of them as "domestic terrorists."

25         34.    Notably, Plaintiffs Dave Bundy, Mel Bundy, O'Shaughnessy and Woods were

26    falsely indicted in the Underlying Action on sixteen (16) criminal counts, including, without

27    limitation, conspiracy, conspiracy to impede federal officers, assaulting, threatening, extorting,

28    and obstructing federal officers, and four (4) counts of using firearms in crimes of violence

resulting from a "standoff" with agents of the BLM and other federal agencies near Bunkerville, Nevada in connection with the **UNITED STATES** Cattle Impoundment Operation.

35.     During that same period of time, Plaintiffs Marylynn Bundy and Briana Bundy were harassed, targeted, repeatedly followed and instigated by the GOVERNMENT **EMPLOYEES** and other agents / officers of the aforementioned federal agencies; and they, along with their children, were forced to endure, among other things: stress and mental, physical and emotional anguish; loss of consortium resulting from the **UNITED STATES'** egregious imprisonment of Plaintiffs Dave Bundy and Mel Bundy; the inability for their family to freely practice their faith and attend weekly family worship services / other church events – tenants of the LDS faith; and financial, occupational and reputational harm as a result of the GOVERNMENT **EMPLOYEES'** egregious branding and characterization of PLAINTIFFS as "domestic terrorists."

### _GOVERNMENT EMPLOYEES' Official Capacity Conduct Performed While Acting in the Scope and Course of Their Employment_

36.     Plaintiffs fully incorporate herein by this reference all allegations contained in paragraphs 1 through **35** of this Complaint.

37.     A March 27, 2014 e-mail authored by a BLM agent (whose name was redacted in court documents from the Underlying Action) to Sal Lauro, BLM Director of the Office of Law Enforcement & Security ("OLES"), and Amy Lueders, BLM's Nevada State Director, confirmed that the U.S. Attorneys Office (led by **AUSA** Bogden in 2014) was "attempting to direct [the] law enforcement efforts" and was actually planning and staging the events well before the rogue criminal prosecution commenced.  Namely:

> [a]s for the rest of the operational guidance, it appears the NV USA is _directing tactical decisions_, something I've never seen in 19 years of law enforcement....[I]'m in a unique situation in which I must work with a prosecution agency that is attempt[ing] to _direct my enforcement efforts_. (Emphasis Added).

38.     **GOVERNMENT EMPLOYEES** Ahmed, Myhre, Bogden, Love, Brunk, Stover and Willis "knew or reasonably should have known that the action[s] [they] took within [their] sphere of official responsibility would violate the constitutional rights of the [PLAINTIFFS], or

. . .

9

1   [*alternatively* they] took the action[s] with ... malicious intent[] to cause a deprivation of

2   constitutional rights or other injury." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).

3         39.    Under the direction, guidance and control of *AUSA's* Ahmed, Myhre and Bogden,

4   *BLM SAC* Love, *Officers* Stover *and* Brunk, and others carefully prepared and fabricated

5   evidence throughout the investigation stage of the Underlying Action, and knowingly,

6   intentionally and willfully concealed exculpatory evidence regarding the Tier 2 Plaintiffs'

7   innocence and the outrageous, unlawful and unconstitutional aspects of the *UNITED STATES*

8   conduct related thereto.

9         40.    For example, *GOVERNMENT EMPLOYEES* Willis, Love, Brunk and Stover,

10   along with other agents and officers of the FBI and BLM, intentionally and systematically

11   fabricated, shaped and "clarified" evidence and testimony, altered records, withheld evidence,

12   and gave false testimony so that the *UNITED STATES* could falsely accuse, obtain grand jury

13   indictments against, detain, prosecute and convict the Tier 2 Plaintiffs of crimes they did not

14   commit.

15         41.    In the days following the April 12, 2014 "standoff" and cattle release, many

16   *GOVERNMENT EMPLOYEE* witnesses authored reports and gave interviews.  Notably, *AUSA*

17   Brunk reported that, on April 6, 2014, he witnessed Dave Bundy's false arrest from a hilltop

18   where *AUSA* Brunk "was acting as a spotter/observer for a BLM sniper."  Nearly a year later, on

19   February 24, 2015, *Agent* Willis attempted to "correct"*AUSA* Brunk's prior statement by having

20   *Officer* Brunk "clarify" that he "never acted as a spotter/observer for a BLM sniper, nor did he

21   ever tell the FBI [that] he acted as a spotter/observer for a BLM sniper during his original

22   interview."

23         42.    Upon information and belief, *Agent* Willis attempted to "correct" the record and

24   his subsequent testimony to protect himself and *AUSA's* Ahmed, Myhre and Bogden from

25   prosecution for providing or otherwise suborning contrary, perjured testimony before the Grand

26   Jury, and to assist the GOVERNMENT *EMPLOYEES* in furtherance of their unlawful

27   conspiracy.  Upon information and belief, *Agent* Willis's clandestine attempt to "clarify" the

28   statement of an employee of another federal agency (the BLM) was performed at the direction of

1   *AUSA's* Ahmed, Myhre and Bogden.  In this regard, *AUSA's* Ahmed, Myhre, Bogden and Agent

2   Willis each knew that *Officer* Brunk's prior witness statement was true and correct and, to

3   conceal that truth and shroud their own misconduct, falsified evidence and withheld exculpatory

4   evidence to ensure that the GOVERNMENT *EMPLOYEES*' "version of events" matched the

5   fabricated record that *AUSA's* Ahmed, Myhre, Bogden and *Agent* Willis had presented to the

6   Grand Jury to secure rogue indictments against the Tier 2 Plaintiffs.  Not only did *AUSA's*

7   Ahmed, Myhre, Bogden and *Officer* Willis falsely inform the Grand Jury that the UNITED

8   STATES did not deploy snipers in 2014, these same *GOVERNMENT EMPLOYEES* later

9   drafted the indictments to wrongly accuse the Bundy defendants, including the Tier 2 Plaintiffs,

10  of falsely alleging that there were.

11       43.    In furtherance of the GOVERNMENT *EMPLOYEES*' fabricated scheme, *BLM*

12  *SAC* Love cloaked the BLM Cattle Impoundment Operation as merely an effort to enforce a

13  2013 civil court order obtained by *AUSA's* Ahmed and Bogden.  In reality, however, the primary

14  purpose behind the 2014 Cattle Impoundment Operation was to frame and entrap Cliven Bundy,

15  the Tier 2 Plaintiffs and other supporters to react or otherwise physically respond to the

16  GOVERNMENT *EMPLOYEES'* violent, aggressive, excessive and authoritarian tactics, and

17  thereby, "justify" the GOVERNMENT *EMPLOYEES'* planned "use of force" and their

18  fabrication of criminal charges against them.

19       44.    To that end, the GOVERNMENT *EMPLOYEES* staged a confrontation between

20  the Bundys and BLM "contract cowboys" during a local television news interview on March 28,

21  2014.  Notably, *BLM SAC* Love and *Officer* Stover coordinated, timed and orchestrated the

22  arrival of the BLM-hired "contract cowboys" and their corresponding equipment to coincide with

23  a pre-arranged television interview between Cliven Bundy and his sons with KLAS Channel 8

24  News at that same location (an interview, upon information and belief, that was surreptitiously

25  arranged by *BLM SAC* Love and *Officer* Stover).

26       45.    *BLM SAC* Love and *Officer* Stover secretly filmed the encounter between the

27  Bundys and the BLM's "contract cowboys" with the intent of provoking violence and/or

28  hostilities between them – conduct which, in turn, would prompt law enforcement intervention

1   and the planned arrests of Cliven Bundy and his supporters, including, without limitation the

2   Tier 2 Plaintiffs.  The Bundys and their supporters, however, did not respond to the BLM's

3   "contract cowboys" provocation and, instead, peacefully photographed the "contract cowboys" to

4   memorialize the incident and the egregious attempt by the GOVERNMENT *EMPLOYEES* to

5   entrap or otherwise provoke the Bundys into a violent response.

6        46.      Notwithstanding the foregoing, the UNITED STATES would later use video from

7   this March 28, 2014 BLM "contract cowboy" incident to intentionally mislead a federal grand

8   jury into indicting the Tier 2 Plaintiffs, essentially spinning this incident as an example of the

9   Bundys' provocation of the BLM, including their violent response to the BLM's Cattle

10  Impoundment Operation and its "stand-off" area near the Toquop Wash and Interstate-15 in

11  Clark County, Nevada.

12       47.      Moreover, during their investigative efforts in 2013 and leading up to the

13  March and April 2014 incidents, DOJ representatives, including, without limitation, *AUSA's*

14  Ahmed, Myhre and Bogden, upon information and belief, knowingly, intentionally and willfully

15  modified, revised and supplemented the operational plan proposed by *BLM SAC* Love and

16  *Officer* Stover to ensure that the final Cattle Impoundment Operation would, among other things:

17  outrage the ranching community, especially the Bundy family and their supporters; provoke a

18  confrontation between them; and entrap the Bundy family, including, without limitation, the

19  Tier 2 Plaintiffs, into responding with physical acts of violence that would justify the

20  GOVERNMENT *EMPLOYEES*' arrest, detainment and incarceration of  Cliven Bundy, the

21  Tier 2 Plaintiffs and other Bundy family supporters.

22       48.      Pursuant to that scheme, the GOVERNMENT *EMPLOYEES* closed to the

23  public nearly six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm

24  areas, and purposefully forced all those who wanted to challenge the *UNITED STATES* actions

25  to do so at one of two small dirt parcels adjacent to highways in the Bunkerville area known as

26  "First Amendment Zones."  Notably, these two areas, located a considerable distance away from

27  the BLM's Cattle Impoundment Operation and orchestrated "staging area," were, upon

28  information and belief, purposefully selected by *AUSA's* Ahmed, Myhre and Bogden, *BLM SAC*

12

1   Love, **Officers** Stover and Brunk, among others, to maximize the impairment of any protestor's

2   First Amendment rights, including, without limitation, the Tier 2 Plaintiffs and Bundy Family

3   members, and incite those who would protest against the **UNITED STATES** rogue operation and

4   unconstitutional conduct (e.g., the purposeful destruction of the Bundy family's spring sites/

5   artesian wells and accompanying water rights) into a physical altercation.

6       49.     In particular, the GOVERNMENT **EMPLOYEES**' egregious plan, orchestrated

7   by **AUSA's** Ahmed, Myhre and Bogden, **BLM SAC** Love, Stover and Brunk, among others:

8   seized cattle belonging to Cliven Bundy and the Bundy Ranch; visibly transported same to the

9   BLM's "staging area;" demonstrably shooting several other cattle from helicopters circling the

10  Bundy Ranch and surrounding areas; and, after having destroyed several thousands of dollars

11  worth of the Bundy family's water right improvements and artesian springs / aquifers,

12  purposefully parading a convoy of DOI / BLM vehicles and other construction demolition

13  equipment before the Bundys, the Tier 2 Plaintiffs and their supporters to provoke them into

14  resisting or otherwise defying the GOVERNMENT **EMPLOYEES**' efforts.

15      50.     In furtherance of that same scheme, the GOVERNMENT **EMPLOYEES**, and

16  others at their direction and control, later brutally arrested, assaulted, beat and kicked Plaintiff

17  Dave Bundy, as **AUSA's** Ahmed, Myhre **and** Bogden, **BLM SAC** Love, **Officers** Stover and

18  Brunk, among others, had planned.

19      51.     Throughout that entire investigative / pre-judicial process, Defendants Ahmed,

20  Myhre, Bogden, Love, Stover and Brunk, among others, purposefully, intentionally and

21  knowingly sought to infringe upon various well-known and clearly understood federal and state

22  constitutional rights for the calculated and orchestrated purpose to entrap the Bundys, the Tier 2

23  Plaintiffs and their supporters, and instigate them into physically or violently responding to the

24  GOVERNMENT **EMPLOYEES**' egregious actions and interference with those rights.

25      52.     Although the GOVERNMENT **EMPLOYEES** collectively knew that their

26  concocted charges were false, they, nevertheless, deceptively attempted to strong-arm the Tier 2

27  Plaintiffs into accepting a plea (knowing that any such agreement could be used against all of the

28  the other named Bundy defendants in the Underlying Action).  In this regard, the

1    GOVERNMENT **EMPLOYEES**, at the direction of **AUSA's** Ahmed, Myhre and Bogden,

2    advised the Tier 2 Plaintiffs, among other things, that:  a conviction against them on all counts

3    would impose mandatory minimum life sentences which would separate them from their friends,

4    family and loved ones for many years – an outcome that could be avoided if they simply pled

5    guilty to one or more of the bogus conspiracy charges; and, if they did so, the **UNITED STATES**

6    would release them from custody for time served.

7            53.     The GOVERNMENT **EMPLOYEES**, at the direction of **AUSA's** Ahmed, Myhre

8    and Bogden, directed that informants be planted among the Tier 2 Plaintiffs during their

9    incarceration and that other inmates housed with the Tier 2 Plaintiffs surreptitiously be offered

10   the immediate release from custody if those inmates would testify falsely against the Tier 2

11   Plaintiffs regarding the **UNITED STATES** concocted criminal charges.

12           54.     The GOVERNMENT **EMPLOYEES**, at the direction of **AUSA's** Ahmed, Myhre

13   and Bogden, also prepared, instructed, and directed others to prepare fabricated investigative

14   documents for those inmates to sign, thus manufacturing false evidence that would be used in

15   their rogue prosecution against the Tier 2 Plaintiffs in violation of law and said Plaintiffs'

16   constitutional and due process rights.

17   **The State of Nevada's Intervention & De-Escalation Efforts**

18           55.     Recognizing that the unlawful and unconstitutional powder-keg lit by the

19   **UNITED STATES** was rapidly escalating out of control, Nevada's former Governor (Brian

20   Sandoval), former Clark County Sheriff (Doug Gillespie) and Assistant Clark County Sheriff

21   (Joe Lombardo) intervened to de-escalate the matter.

22           56.     Notably, in the midst of increasing political pressure and public outrage over the

23   GOVERNMENT **EMPLOYEES'** egregious conduct, the former Nevada Governor, Clark

24   County Sheriff and Assistant Sheriff took control of the scene and, through Assistant Clark

25   County Sheriff Joe Lombardo issued orders directing the BLM and GOVERNMENT

26   **EMPLOYEES** to wind-down their operation and to release the Bundy family's cows from the

27   cattle pen.

28   . . .

14

1    57.    *AUSA* Bodgen and *BLM SAC* Love, recognizing that the GOVERNMENT

2   *EMPLOYEES'* unlawful and unconstitutional conduct had failed to produce the planned result,

3   implemented those orders and directed federal and state officers to ensure that "a Bundy," if not

4   Cliven Bundy himself, would pull the pins from the cattle pens so that the DOJ could use that

5   affirmative act to establish the GOVERNMENT *EMPLOYEES'* fabricated theories of criminal

6   conspiracy, extortion, armed robbery, among other false claims, against the Bundy defendants

7   and Tier 2 Plaintiffs.

8    58.    In accordance with the State orders and at the direction of the GOVERNMENT

9   *EMPLOYEES*, Margaret Houston, a sister of Cliven Bundy, ultimately "pulled the pin" on the

10   cattle pen and released the cattle. *AUSA's* Ahmed, Myhre and Bogden, in turn, used that

11   physical act to support the *UNITED STATES* rogue prosecution of the Bundy defendants,

12   including, without limitation, the Tier 2 Plaintiffs.

13   **Defendant's Longbow Productions Scam**

14    59.    In furtherance of the GOVERNMENT *EMPLOYEES'* scheme to wrongfully

15   prosecute the Bundy defendants, including the Tier 2 Plaintiffs, and to manufacture evidence in

16   support of the fabricated claims against them, *AUSA's* Ahmed, Myhre, Bogden and *Agent* Willis

17   concocted a scheme to deceive the Bundys, the Tier 2 Plaintiffs and their supporters, into making

18   incriminating statements or confessions through the *UNITED STATES* unprecedented

19   undercover FBI operation named "Longbow Productions."

20    60.    Notably, *AUSA's* Ahmed, Myhre *and* Bogden, and *Agent* Willis, among others,

21   directed hundreds of thousands of taxpayer dollars into an operation in which masqueraded FBI

22   undercover agents falsely posed as a film crew making a documentary of the 2014 "standoff."

23    61.    Upon information and belief, *AUSA's* Ahmed, Myhre *and* Bogden, and *Agent*

24   Willis directed the FBI undercover agents to entice the Tier 2 Plaintiffs, along with the other to-

25   be-named Bundy defendants, with alcohol, money and other goods and favors to exaggerate

26   their respective involvement in the GOVERNMENT *EMPLOYEES'* orchestrated "standoff" or

27   to otherwise misstate, exaggerate or falsely hype the event itself, so that the UNITED STATES

28   . . .

15

1  could increase the likelihood of securing convictions in rogue criminal proceedings that the

2  GOVERNMENT **EMPLOYEES** would ultimately initiate.

3      62.      To that end, **AUSA's** Ahmed, Myhre **and** Bogden, and **Agent** Willis, among

4  others, successfully deceived various Bundy family members and supporters into participating in

5  the "staged" interviews – interviews in which the undercover FBI agents, at said Defendants

6  prodding, asked leading questions, with the answers later being selectively edited and later used

7  by the GOVERNMENT **EMPLOYEES** in the Underlying Action.

8  **Subornation of Perjury & Falsehoods to the Grand Jury**

9      63.      The fact that **AUSA** Bogden had scripted and directed the filming of a video

10  depicting "a Bundy" removing a pin from the cattle pen at the **UNITED STATES** Cattle

11  Impoundment Operation became problematic for **AUSA's** Ahmed, Myhre and Bogden when they

12  sought to obtain a grand jury indictment against the Bundy defendants, including the Tier 2

13  Plaintiffs, the following year.

14      64.      Since AUSA Bogden stepped out of his role as prosecutor and assumed the role of

15  investigator (one who directed, supervised and led law enforcement personnel in the filming of

16  that incident), he was a material witness thereto - one who was never cross-examined or

17  otherwise testified regarding that unprotected, unprivileged conduct.

18      65.      Notably, during the October 14, 2015 Grand Jury proceedings, **AUSA** Myhre

19  purposefully avoided a Grand Juror's question directed at the UNITED STATES involvement in

20  the pin removal act and purposefully proffered evasive testimony to avert **BLM SAC** Love from

21  disclosing the truth regarding that incident.  In particular:

22          **MYHRE**:      But you never received any order to release the cattle?

23          **LOVE**:      No sir, did not.

24          An unknown grand juror asked Love to clarify his statements indicating that Dave
           Bundy and Ryan Bundy *"did release the cattle""but on your [Love's] authority, is*
25          *that correct?"*  Love responded *"No I did not give them the authority to release*
           *the cattle."*  The Grand juror followed up: *"No but I'm just saying it's on your*
26          *authority you had them release the cattle . . . ."*

27          At that point Myhre interrupted the proceedings, stopped Love from answering
           and began to testify himself by asking leading questions.
28

16

| | | |
|---|---|---|
| **MYHRE**: | "But your decision wasn't to release the cattle, your decision was to abandon the ICP, Incident Command Post is that correct? | |
| **LOVE**: | That is correct and then to turn over – obviously by abandoning the cattle are left there in the pen and I was thereby leaving the cattle and then admonishing and explaining to the Bundys that should they so choose to release those cattle they would be doing so under potential violation of federal law with recourse." | |
| **MYHRE**: | "So in essence you were not giving them permission to release the cattle? You are saying we're leaving and that if you release the cattle it's in violation of federal law." | |

66.     Throughout 2015 and 2016, *AUSA's* Ahmed, Myhre *and* Bogden, *Agent* Willis, *BLM SAC* Love, *Officers* Stover and Brunk deliberately, maliciously and intentionally mislead the Grand Jury so that they could falsely obtain indictments against the Tier 2 Plaintiffs.

67.     For example, on June 29, 2015, *AUSA* Myhre and *Agent* Willis knowingly, intentionally and willfully misled the Grand Jury regarding the circumstances surrounding Plaintiff Dave Bundy's April 6, 2014 false arrest.

68.     Specifically, *AUSA* Myhre egregiously stated that Plaintiff Dave Bundy was doing "some sort of reconnaissance or trying to take photographs of the BLM as they were coming off the range ..." with Agent Willis testifying that Dave Bundy was in a "closed area" and that the "agents encountered them in a closed area and asked them to leave."

69.     *AUSA* Myhre and *Agent* Willis, however, knew that they were intentionally deceiving and misleading the Grand Jury when they provided that false information and testimony.   In particular, said *GOVERNMENT EMPLOYEES* knew that, on that day, Dave Bundy, his brother Ryan Bundy, and other Bundy family members were traveling from Utah to the Bundy Ranch in Clark County, Nevada to bring birthday flowers to their mother via Nevada State Route 170 (S.R. 170) – which was not a "closed area" – when Dave Bundy observed what appeared to be snipers on the hill above.

70.     Dave Bundy lawfully parked his car on the side of S.R. 170 and began photographing and filming the hilltop snipers with his Apple iPad.  BLM agents, in response, falsely arrested him (and did so without any arrest authority or probable cause); illegally towed and searched his car; unlawfully removed and confiscated his iPad without a warrant (an electronic device that contained photographs and video of the hilltop snipers, along with a

1  recording of his telephone conversation to a 9-1-1 operator as the BLM agents were unlawfully

2  arresting him).  Pursuant to a District Court Order, Dave Bundy's Apple iPad was eventually

3  returned to him in 2017 in an erased, altered and damaged state.

4       71.    On March 2, 2016, *AUSA's* Ahmed, Myhre and Bogden knowingly and

5  intentionally suborned perjurious testimony from *Agent* Willis to secure an indictment

6  against Dave Bundy, falsely claiming that Dave Bundy's vehicle was intended to impede the

7  GOVERNMENT *EMPLOYEES*' convoy as it emerged onto on S.R. 170.  Specifically:

8          AHMED:     And the BLM believed because of the positions of the vehicles,
   including Dave Bundy's, that they could easily impede that
9                           convoy as it emerged onto State Route 170, isn't that right?

10          WILLIS:     Yes.

11       72.    Notably, *AUSA's* Ahmed, Myhre *and* Bogden and *Agent* Willis knew that

12  Plaintiff Dave Bundy's vehicle was lawfully parked more than fifty (50) feet away from the

13  S.R. 170 intersection and, as such, could not conceivably have been perceived as an attempt to

14  impede the GOVERNMENT *EMPLOYEES*' convoy.  Further, *AUSA's Ahmed, Myhre and*

15  *Bogden and Agent Willis* also unequivocally knew, but intentionally and willfully withheld

16  from the Grand Jury, that there never was any probable cause or justification to arrest Dave

17  Bundy.

18       73.    At that same time, *AUSA* Ahmed knowingly, intentionally and willfully elicited

19  false testimony from *Agent* Willis regarding Plaintiff Mel Bundy, baldly testifying that, on

20  April 12, 2014, Plaintiff Mel Bundy threatened federal officers when, in fact, *AUSA* Ahmed and

21  *Agent* Willis knew that there was absolutely no evidence of any such threats, nor probable cause

22  to substantiate Mel Bundy's arrest.

23       74.    On September 16, 2015, *AUSA* Ahmed knowingly, intentionally and willfully

24  elicited false and misleading testimony from *Officer* Stover before the Grand Jury regarding the

25  BLM's threat assessments of the Bundy's and Tier 2 Plaintiffs and their propensity for engaging

26  in potential acts of violence.  *AUSA* Ahmed and *Officer* Stover, well-aware that the BLM

27  assessments actually established that the Bundys would not engage in potential acts of violence,

28  . . .

18

1  elicited and provided false testimony claiming that the Bundy's would, in fact, respond with
2  potential acts of violence.

3      75.    At that same time, *AUSA* Ahmed and *Officer* Stover also knowingly,
4  intentionally and willfully elicited and provided false and misleading testimony regarding the
5  UNITED STATES use of snipers.  Despite the fact that numerous federal agents / snipers were
6  located on hillsides around the Bundy Ranch and Cattle Impoundment Operation's "staging
7  area" in April 2014 pursuant to the GOVERNMENT *EMPLOYEES*' scheme, *AUSA* Ahmed
8  and *Officer* Stover egregiously claimed that the operational plan did not include the use of
9  snipers, and the purported use of snipers was merely a story concocted by the Bundy's and their
10 supporters.

11     76.    *AUSA* Ahmed and *Officer* Stover also materially misled the Grand Jury
12 regarding the GOVERNMENT *EMPLOYEES'* First Amendment Zones imposed on the Bundy
13 family, the Tier 2 Plaintiffs and their supporters in March and April 2014.

14     77.    As noted above, the GOVERNMENT *EMPLOYEES* closed to the public nearly
15 six hundred thousand (600,000) acres of land in the Gold Butte and Overton Arm areas and, in
16 so doing, imposed the single largest infringement on free speech in American history (measured
17 geographically).

18     78.    Hundreds of Americans traveled to the Bunkerville, Nevada area to protest the
19 *UNITED STATES* impairment of the Bundy family's First Amendment right to free speech and
20 the expression of their religious freedoms – restrictions which were also denounced by
21 numerous public officials who readily acknowledged the unconstitutionality of same.

22     79.    Consequently, *AUSA* Ahmed and *Officer* Stover knew that in order for the
23 Grand Jury to indict the demonstrators (persons who merely came to protest the
24 GOVERNMENT *EMPLOYEES'* egregious conduct, support the Bundy family and exercise
25 their own constitutionally-protected free speech rights), they had to knowingly, intentionally and
26 willfully mislead Grand Jury regarding same.

27     80.    To that end, on September 16, 2015, *AUSA* Ahmed and *Officer* Stover
28 knowingly, intentionally and willfully misled the Grand Jury into believing the following:

19

| | | |
|---|---|---|
| 1 | **AHMED:** | Did the operation plan consider having designated areas in the operation area <u>for people who wanted to view</u> the governments activities or the impound operation itself?" |
| 2 | | |
| 3 | **STOVER:** | "It did." |
| 4 | **AHMED:** | "And were those areas actually what would come to be known as the First Amendment zones or First Amendment areas?" |
| 5 | **STOVER:** | "Correct. . . . It included those areas <u>not to dictate</u> to people where they could express their First Amendment rights but it allowed an area that was safe for the public to go to and get them in <u>as close proximity as possible</u> to the closed operational area so they would |
| 6 | | |
| 7 | | have chance to <u>if they wanted to view some of the gather operations</u>?" |
| 8 | | |
| 9 | **AHMED:** | "Is this setting up of areas <u>as close as possible</u> to where the operation activities are taking place, is that something that the BLM includes regularly in its gathering operations?" |
| 10 | | |
| 11 | **STOVER:** | "Sure. . . ." |

81.     Notably, however, *AUSA* Ahmed and Stover knew that the First Amendment Zones: (1) <u>were mandatory</u> (i.e., federal officers told protesters that they must go to the designated First Amendment Zones); (2) offered <u>no view whatsoever of any Cattle Impoundment Operations</u>; (3) were located <u>miles away from those operations</u>; and (4) were actually patrolled, monitored and watched over by armed government agents.

**Defendant*'s* Rogue Indictment**

82.     On March 2, 2016, after several months of presenting fabricated, misleading and perjured evidence and testimony to the Grand Jury, *AUSA's* Ahmed, Myhre *and* Bogden, *BLM SAC* Love, *Officers* Stover *and* Brunk, and *Agent* Willis obtained an indictment against the Tier 2 Plaintiffs – evidence which these *GOVERNMENT EMPLOYEES* knew was false and directly contradicted by exculpatory evidence which said *representatives* knowingly, intentionally and willfully withheld from the Grand Jury, the Bundy defendants, including the Tier 2 Plaintiffs and their counsel.

83.     That same day, *AUSA's* Ahmed, Myhre *and* Bogden, and *Agent* Willis egregiously sought the issuance of arrest warrants for Dave Bundy, Mel Bundy, O'Shaughnessy and Woods, knowing that there was absolutely no probable cause whatsoever to support any of their arrests.

1     84.    To that end, *AUSA's* Ahmed, Myhre *and* Bogden, and *Agent* Willis withheld

2  exculpatory evidence from the judicial officer that issued the warrants, and knowingly used

3  false, fabricated and manufactured evidence to secure same.

4     85.    On March 3, 2016, the Tier 2 Plaintiffs were unlawfully arrested and taken into

5  custody.

6     86.    Shortly thereafter, the GOVERNMENT *EMPLOYEES* filed their indictment

7  against them and, although the indictment measured sixty (60) pages in length and accused 19

8  men of 16 separate criminal counts, the indictment was silent as to any basis or probable cause

9  to detain, arrest or otherwise prosecute the Tier 2 Plaintiffs for any of those crimes.

10     87.    Notably, the Tier 2 Plaintiffs actual conduct (i.e., lawfully protesting the

11  Government's egregious actions, standing, walking, riding horses and taking pictures of

12  Defendants' unlawful conduct) was deceptively described by the GOVERNMENT

13  *EMPLOYEES* in their rogue indictment as threatening, assaulting and extorting federal officers,

14  obstructing justice, and conspiring to violate federal laws or impede federal officers.

15     88.    Further, after the indictment was filed in the Underlying Action, *AUSA's*

16  Ahmed, Myhre *and* Bogden, *Agent* Willis, *BLM SAC* Love, and *Officers* Stover and Brunk

17  conspired with one another to conceal, among other evidence, Dave Bundy's iPad, the BLM

18  threat assessments, the GOVERNMENT *EMPLOYEES'* use of snipers and other exculpatory

19  evidence from the Tier 2 Plaintiffs, their counsel, and all of the Bundy defendants in the

20  Underlying Action.

21     89.    The indictment also falsely claimed that the Bundy defendants in the Tier 1

22  proceeding "caused images of DAVE BUNDY's arrest to be broadcasted ... combining them

23  with false, intentionally misleading and deceptive statements 'to the effect' [that the] BLM

24  supposedly employed snipers ... used excessive force ... and arrested Bundy for exercising his

25  First Amendment rights."

26     90.    During an evidentiary hearing of the Tier 1 trial, it was irrefutably established

27  that the BLM did, in fact, employ snipers and use excessive force.

28

1    91.    Those same facts, in conjunction with the United States' intentional withholding

2    of exculpatory evidence (*Brady* disclosures and materials) and prosecutorial misconduct

3    prompted Chief Judge Navarro to dismiss the United States case against the Tier 1 defendants.

4    92.    The indictment also baldly asserted that the Tier 2 Plaintiffs had used firearms in

5    several serious crimes of violence.  At no time, however, did Plaintiffs Dave Bundy, Mel Bundy

6    or O'Shaughnessy ever display, use, or threaten to use firearms, nor did they commit any crimes,

7    let alone a crime of violence.   While it is true that Plaintiff Woods was lawfully in possession

8    of a firearm at certain times on April 12, 2014, his possession thereof was in full accordance

9    with his Second Amendment right to bear arms and, at all times, was maintained in a safe,

10   proper and lawful manner – at no time did he display, use, or threaten to use his firearm, nor

11   commit any crime, let alone a crime of violence.

12   **False Allegations Against O'Shaughnessy**

13   93.    The rogue indictment against Plaintiff O'Shaughnessy simply alleged that he

14   "was a resident of Arizona who traveled to Nevada with the intent to commit the crimes set

15   forth" therein, and accused him of being a "mid-level leader and organizer of the conspiracy

16   who, among other things: organized gunmen and other Followers; led gunmen and other

17   Followers in the assault and extortion of federal law enforcement officers at the Impound Site;

18   organized protection for members of the criminal enterprise; and organized armed patrols and

19   security checkpoints."

20   94.    At no time, however, did the *UNITED STATES* possess probable cause to

21   arrest, detain or otherwise prosecute Plaintiff O'Shaughnessy.

22   95.    Moreover, the GOVERNMENT *EMPLOYEES and the UNITED STATES*

23   knew that each and every material accusation set forth in the Indictment against Plaintiff

24   O'Shaughnessy was inaccurate, false and intentionally misleading.

25   **False Allegations Against Woods**

26   96.    The rogue indictment against Plaintiff Woods simply alleged that he "was a

27   resident of Arizona who traveled to Nevada with the intent to commit the crimes set forth"

28   therein, and accused him of being a "gunman who threatened, impeded, intimidated, interfered

1   with, assaulted and extorted federal law enforcement officers while in the performance of their

2   duties, as described [therein]."

3       97.    At no time, however, did the **UNITED STATES** possess probable cause to

4   arrest, detain or otherwise prosecute Plaintiff Woods.

5       98.    Moreover, the GOVERNMENT **EMPLOYEES and the UNITED STATES**

6   knew that each and every material accusation set forth in the Indictment against Plaintiff Woods

7   was inaccurate, false and intentionally misleading.

8          **False Allegations Against Dave Bundy & Mel Bundy**

9       99.    The rogue indictment against Plaintiffs Dave Bundy and Mel Bundy, based solely

10  upon their status as sons of Cliven Bundy, baldly accused them of being "leaders and organizers

11  of the conspiracy who, among other things: recruited gunmen and other Followers; interfered

12  with impoundment operations through threats and use of force and violence; interfered with

13  impoundment operations by attempting to extort BLM contractors; led the armed

14  assault against federal law enforcement officers at the Impoundment Site; delivered extortionate

15  demands to law enforcement officers; and extorted federal law enforcement officers."

16      100.   The indictment also materially misrepresented Dave Bundy's actions that

17  ultimately led to his false arrest on April 6, 2014, egregiously claiming that he "interfered with

18  impoundment operations by positioning [himself] to block a BLM convoy and refusing to leave

19  the area when asked to do so" and after "[f]ailing to leave after repeated requests ... [he] was

20  arrested by law enforcement officers."

21      101.   Notably, as images from the April 6, 2014 incident confirmed (images of which

22  **AUSA's** Ahmed, Myhre **and** Bogden and **Agent** Willis were well-aware at that time), Plaintiff

23  Dave Bundy's vehicle was parked at least fifty (50) feet away from the claimed S.R. 170

24  intersection where the BLM convoy would ultimately travel and, at that location, it was

25  impossible for Dave Bundy's vehicle to have "blocked" the BLM convoy.

26      102.   Further, as **AUSA's** Ahmed, Myhre **and** Bogden and **Agent** Willis were also well

27  aware, Dave Bundy was lawfully exercising his First Amendment rights when he photographed

28

                                    23

1  and filmed on his iPad the BLM officers, spotters and snipers in plain view from the public

2  highway, and that he was under no legal obligation "to leave the area when asked to do so."

3      103.   The GOVERNMENT *EMPLOYEES* also knew that Dave Bundy's iPad

4  captured photographs and video of those entire events (evidence which completely exonerated

5  Dave Bundy, established the egregiousness of the GOVERNMENT *EMPLOYEES'* actions that

6  day, undermined the fabricated testimony of *AUSA* Ahmed and *Agent* Willis to the Grand Jury,

7  and exposed other multiple false and misleading statements contained in the indictment),

8  including, without limitation, Dave Bundy's telephone call with a 9-1-1 operator while he was

9  being falsely arrested and assaulted by the BLM officers.

10      104.   Upon information and belief, *AUSA's* Ahmed, Myhre *and* Bogden, *BLM SAC*

11  Love, *Officers* Stover *and* Brunk, and *Agent* Willis, among others, hid, concealed, converted,

12  altered, damaged and/or erased this exculpatory evidence from Dave Bundy's iPad and

13  concealed same from the Tier 2 Plaintiffs as part of the GOVERNMENT *EMPLOYEES*'

14  egregious scheme to wrongfully convict the Tier 2 Plaintiffs and imprison them for life for

15  crimes they did not commit.

16      105.   The GOVERNMENT *EMPLOYEES* also failed to disclose that Dave Bundy

17  was released from custody the following day without prosecution.

18      106.   With regard to Plaintiff Mel Bundy, the GOVERNMENT *EMPLOYEES*' rogue

19  indictment baldly alleged that his presence in a vehicle while a reporter (Pete Santilli)

20  questioned *BLM SAC* Love as to what the BLM "would do if 10,000 people show[ed] up" to

21  the "stand-off" constituted a "threat" by the reporter and one that the GOVERNMENT

22  *EMPLOYEES* unconscionably imputed to Mel Bundy.

23      107.   The GOVERNMENT *EMPLOYEES* also falsely alleged that on April 9, 2014,

24  Mel Bundy, along with others, "assaulted, interfered with, impeded and intimidated federal

25  officers by, among other things, intercepting and blocking a convoy of BLM vehicles engaged in

26  impoundment operations ...."

27  . . .

28  . . .

1   108.   Notably, however, at that time, the GOVERNMENT *EMPLOYEES* knew that

2   Mel Bundy was being interviewed by news reporters at a location well over a mile away and, as

3   such, was not, nor could he have been, present as the GOVERNMENT *EMPLOYEES* alleged.

4   109.   Further, the GOVERNMENT *EMPLOYEES* also knew that photographic and

5   video evidence memorializing the claimed incident further unequivocally confirmed that Mel

6   Bundy was not there at that time.

7   ***The GOVERNMENT EMPLOYEES* Wrongful Concealment of Threat Assessments &
Other Misrepresentations to Federal & Magistrate Judges**

8

9   110.   In furtherance of GOVERNMENT *EMPLOYEES*' conspiracy to keep the

10  Tier 2 Plaintiffs falsely imprisoned (i.e., so that their release from custody could be used as a

11  potential bargaining chip in securing a negotiated plea arrangement from one of the Tier 1

12  defendants, most notably, Cliven Bundy), *AUSA's* Ahmed, Myhre and Bogden argued to the

13  Court that the Tier 2 Plaintiffs were the most dangerous, violent criminals in the history of

14  Nevada.

15  111.   *AUSA's* Ahmed, Myhre and Bogden made these egregious statements knowing,

16  among other things, that:  (a) according to their own internal (i.e., DOJ / U.S. Attorney's Office)

17  threat assessments, none of the Tier 2 Plaintiffs were dangerous or violent, nor did they

18  otherwise pose any risk of being same; (b) their false statements would enable the *UNITED*

19  *STATES* to wrongfully detain the Tier 2 Plaintiffs, preclude them from being released on bail,

20  and deny them a speedy trial; and (c) their falsehoods would deprive the Tier 2 Plaintiffs of

21  various federal and state constitutional rights.

22  112.   *AUSA's* Ahmed, Myhre and Bogden also materially misled the Court regarding

23  evidence which undermined the *UNITED STATES'* false portrayal of the Tier 2 Plaintiffs and

24  the lengths to which the Tier 2 Plaintiffs would purportedly go in defiance of the actions taken

25  by the UNITED STATES.

26  113.   For example, during detention hearings in 2016, *AUSA* Ahmed knowingly,

27  intentionally and willfully advised a U.S. Magistrate Judge that, on April 12, 2014, Tier 2

28  Plaintiff Mel Bundy brought his own children into the Toquop Wash (the location of the "stand-
off") and directed those children, in a strategic and tactical manner, to further the "massive

25

1   assault on federal officers" that was falsely described in the underlying indictment. *AUSA*

2   *Ahmed* knew that her statements were false when made and that, during the "standoff," Mel

3   Bundy's children were located many miles away in another state.

4       114.   AUSA's Ahmed, Myhre and Bogden, in furtherance of the GOVERNMENT

5   *EMPLOYEES'* conspiracy, also knowingly, intentionally and willfully misled the Court on

6   multiple occasions, regarding the FBI's involvement in this matter – egregiously representing

7   that the FBI was not involved, and that their claimed involvement by the Bundy defendants,

8   including the Tier 2 Plaintiffs, was complete "fiction" on their part and true "urban folklore."

9       115.   In reality, however, *AUSA's* Ahmed, Myhre and Bogden knew, among other

10  things, that the FBI was actively involved and, among other things:  had engaged in an extensive

11  surveillance and reconnaissance effort which included, without limitation, the Bundy defendants

12  and Tier 2 Plaintiffs, their respective properties and the aforementioned First Amendment

13  zones; conducted around-the-clock monitoring of those areas from an FBI Command Center

14  which, upon information and belief, enabled real-time viewing of same by agency department

15  officials located in Washington, D.C.; and had extensive exculpatory photographic and video-

16  surveillance documentation – none of which was ever produced, disclosed or otherwise

17  identified by the GOVERNMENT *EMPLOYEES* and, in fact, was knowingly, intentionally

18  and willfully concealed by them in furtherance of their conspiracy – the existence of which was

19  revealed for the first time during trial proceedings involving the Tier 3 group).

20  **The Unraveling of the GOVERNMENT *EMPLOYEES'* Conspiracy**

21      116.   In early February 2017, during the first trial of the Tier 3 defendants,[3] a BLM

22  Case Agent assigned to assist *BLM SAC* Love and a material witness for the UNITED STATES

23  (i.e., BLM Special Agent Larry Wooten) noticed that the defense lawyers were not cross-

24  examining government witnesses with expected questions arising from exculpatory evidence

25  which Mr. Wooten had provided to the UNITED STATES and *AUSA's* Ahmed, Myhre and

26  Bogden.

27  

28      [3]   The Tier 3 group consisted of Eric Parker, Scott Drexler, Greg Burleson, Steve
Stewart, Todd Engel and Rick Lovelein.

1    117.    On February 16, 2017, Mr. Wooten confronted *AUSA's* Ahmed, Myhre and

2    Bogden regarding this issue, whether the UNITED STATES had properly disclosed the

3    exculpatory evidence and other suspected *Brady* violations.

4    118.    Fearing that BLM Special Agent Wooten would reveal the nature and extent of

5    the GOVERNMENT *EMPLOYEES'* conspiracy and its unlawful/unconstitutional conduct,

6    *AUSA* Myhre retaliated by abruptly removing Mr. Wooten from the prosecution team and any

7    further involvement in the case.

8    119.    To that end, on February 18, 2017, *AUSA* Myhre directed that Mr. Wooten's

9    office be raided and ordered that all of Mr. Wooten's papers and electronic files related to the

10   Underlying Action be seized.

11   120.    Upon information and belief, when Mr. Wooten learned of the unauthorized

12   search of his office and the seizure of all of his case files from the Underlying Action, he

13   complained of same to his superiors and, at that time, was threatened and warned by Myhre-

14   directed BLM officers to keep his mouth shut about the prosecutorial misconduct in the case.

15   121.    After conferring with a DOI/BLM Ethics Official, the U.S. Office of Special

16   Counsel ("OSC"), the BLM Office of Law Enforcement & Security Director (Salvatore Lauro)

17   and the DOJ Office of Professional Responsibility ("OPR") – each of whom ignored

18   Mr. Wooten's concerns and sought to distance themselves from same – Mr. Wooten submitted a

19   whistleblower complaint to the DOJ Associate Deputy Attorney General and National Criminal

20   Discovery Coordinator (Andrew D. Goldsmith) to expose the GOVERNMENT *EMPLOYEES'*

21   egregious conduct, including, without limitation, the non-disclosure of exculpatory evidence and

22   other *Brady* violations.

23   122.    Specifically, in a document entitled "Disclosure and Complaint Narrative in

24   Regard to Bureau of Land Management Law Enforcement Supervisory Misconduct and

25   Associated Cover-ups as well as Potential Unethical Actions, Malfeasance and Misfeasance by

26   United States Attorney's Office Prosecutors from the District of Nevada, (Las Vegas) in

27   Reference to the Cliven Bundy Investigation," (hereinafter "Whistleblower Complaint"),

28   . . .

1   Mr. Wooten exposed the GOVERNMENT **EMPLOYEES**' conspiracy and its unlawful,

2   unconstitutional conduct.

3        123.    Notably, Mr. Wooten revealed, among other things, that:

4          A.    There was a "widespread pattern of bad judgment, lack of discipline,

5   incredible bias, unprofessionalism and misconduct, as well as likely policy, ethical, and legal

6   violations among senior and supervisory staff at the BLM's Office of Law Enforcement and

7   Security."

8          B.    The "issues amongst law enforcement supervisors in our agency made a

9   mockery of our position of special trust and confidence, portrayed extreme unprofessional bias,

10  adversely affected our agency's mission and likely the trial regarding Cliven Bundy and his

11  alleged co-conspirators and ignored the letter and intent of the law."

12         C.    "The issues [he] uncovered ... also likely put [the DOI / BLM] and

13  specific law enforcement supervisors in potential legal, civil, and administrative jeopardy."

14         D.    This was "the largest and most expansive and important investigation

15  ever within the Department of Interior."

16         E.    **BLM** SAC Love "specifically took on assignments that were potentially

17  questionable and damaging (such as document shredding, research, discovery email search

18  documentation and as the affiant for the Dave Bundy iPad Search Warrant) ... [Mr. Wooten felt

19  like **BLM** SAC Love] wanted to steer the investigation away from misconduct discovery ..."

20         F.    "The misconduct caused considerable disruption in our workplace, was

21  discriminatory, harassing and showed clear prejudice against the defendants, their supporters

22  and Mormons."

23         G.    "Oftentimes this misconduct centered on being sexually inappropriate,

24  profanity, appearance/body shaming and likely violated privacy and civil rights."

25         H.    There were "potentially captured comments in which [DOI / BLM] law

26  enforcement officers allegedly bragged about roughing up Dave Bundy, grinding his face into

27  the ground, and Dave Bundy having little bits of gravel stuck to his face" as a result of his

28  unlawful arrest.

1     I.  "On two occasions, [Mr. Wooten] overheard [**BLM** SAC Love] tell

2 [another DOI / BLM assistant special agent in charge] that another/other BLM employee(s) and

3 potential trial witnesses didn't properly turn in the required discovery material (likely

4 exculpatory evidence."

5     J.  **BLM** SAC Love "even instigated the unprofessional monitoring of jail

6 calls between defendants and their wives, without prosecutor or FBI consent, for the apparent

7 purpose of making fun of post arrest telephone calls ...."

8     K.  **BLM** SAC Love sought "to command the most intrusive, oppressive,

9 large scale, and militaristic trespass cattle impound possible.  Additionally, this investigation

10 also indicated excessive use of force, civil rights and policy violations."

11     L.  **BLM** SAC Love was not regularly updating the U.S. Attorney's Office

12 "on substantive and exculpatory case findings and unacceptable bias indications" and, as such,

13 [Mr. Wooten] personally informed ... Acting United States Attorney Steven Myhre and

14 Assistant United States Attorney (AUSA) Nadia Ahmed, as well as Federal Bureau of

15 Investigation (FBI) Special Agent Joel Willis by telephone of these issues."

16     M.  For example, Mr. Wooten advised **AUSA** Myhre that when Plaintiff Dave

17 Bundy was arrested "on April 6, 2014, the BLM ... the BLM SAC and others were told not to

18 make any arrests" (i.e., they had no arrest authority) and that **BLM** SAC Love made exculpatory

19 statements that would need to be disclosed to the defense team including, without limitation,

20 "Go out there and kick Cliven Bundy in the mouth (or teeth) and take his cattle" and **BLM** SAC

21 Love's directive to DOI / BLM officers "to get the troops fired up to go get those cows and not

22 take any crap from anyone" – statements which **AUSA** Myhre acknowledged would need to be

23 disclosed but never were.

24     N.  On February 18, 2017, when Mr. Wooten "was removed from [his]

25 position, ... [**BLM** SAC Love] conducted a search of [Mr. Wooten's] individually occupied

26 secured office and secured safe within that office.  During that search, ... [**BLM** SAC Love]

27 without notification or permission seized the Cliven Bundy/Gold Butte Nevada Investigative

28 'hard copy' Case File, notes (to include specific notes on issues [Mr. Wooten] uncovered during

1   the 2014 Gold Butte Nevada Trespass Cattle Impound and 'lessons learned') and several

2   computer hard drives that contained case material, collected emails, text messages, instant

3   messages, and other information."

4           O.    Following this seizure outside of [Mr. Wooten's] presence and without

5   [his] permission, [**BLM** SAC Love] didn't provide any property receipt documentation

6   (DI-105/Form 9260-43) or other chain of custody documentation (reasonably needed for trial)

7   on what was seized."

8           P.    Mr. Wooten "was also aggressively questioned [by **BLM** SAC Love]

9   about who [Mr. Wooten] had told about the case related issues and other severe issues

10   uncovered in reference to the case and [**BLM** SAC Love]."

11           Q.    Mr. Wooten also notes that he was "convinced that [he] was removed to

12   prevent the ethical and proper further disclosure of severe misconduct, failure to correct and

13   report, and cover-ups ...." including, without limitation, "civil rights violations and excessive

14   use of force."

15           R.    To that end, Mr. Wooten identified "the loss/destruction of, or purposeful

16   non-recording of key evidentiary items (Unknown Items 1 & 2, Video/Audio, April 6, 2014,

17   April 9, 2014, April 12, 2014 - the most important and critical times in the operation)."[4]

18   Tellingly, Mr. Wooten concluded that he "believe[d] these issues would shock the conscious of

19   the public and greatly embarrass [the BLM] if they were disclosed."

20       124.    By October 2017, trial of the Tier 1 Bundy defendants[5] was nearing

21   commencement and defense lawyers in that action expressed concerns to the Court regarding

22   missing documents and other evidence that had not been produced or otherwise disclosed by the

23   UNITED STATES and **AUSA's** Ahmed, Myhre and Bogden, but was known to exist.

24

25       [4]    In a subsequent e-mail from Mr. Wooten to (now former) DOJ Office of the

26   Inspector General Attorney Mark Masling (who was tasked with investigating this matter *after*
     the Underlying Action was dismissed), Mr. Wooten noted that there was a "dumpster of shredded

27   BLM documents."

28       [5]    The Tier 1 group consisted of Cliven Bundy, his sons Ryan Bundy and Ammon
     Bundy, and Ryan Payne.

1    125.    In response, Chief District Court Judge Navarro held an evidentiary hearing and,

2    at that hearing, numerous *Brady* violations were discovered, including, without limitation,

3    extensive exculpatory evidence regarding the Tier 2 Plaintiffs that had been knowingly,

4    intentionally and willfully withheld by the UNITED STATES and *AUSA's* Ahmed, Myhre and

5    Bogden.

6    126.    In this regard, as the January 8, 2018 Hearing Transcript ("Transcript") from the

7    Tier 1 Motion to Dismiss Hearing unequivocally reveals, Chief Judge Navarro expressly held,

8    among other things, that:

9          A.    "A district court may dismiss an Indictment on the ground of outrageous

10   government conduct if the conduct amounts to [a] due process violation." Transcript at 8:18-21

11   (*quoting United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

12         B.    "To violate due process, governmental conduct must be ... 'so grossly

13   shocking and so outrageous as to violate the universal sense of justice.'" Transcript at 9:01-05

14   (*quoting United States v. Restrepo*, 930 F.2d 705 (1991); *United States v. Ramirez*, 710 F.2d

15   535 (9t h Cir. 1983)).

16         C.    "Outrageous government conduct occurs when the actions of law

17   enforcement officers or informants are so outrageous that due process principles would

18   absolutely bar the government from invoking judicial processes to obtain a conviction."

19   Transcript at 9:09-16 (*quoting United States v. Archie*, 2016 WL 475234 (D.Nev. 2016), *cert*

20   *denied*, 2019 WL 5152784 (9th Cir. 2019); *United States v. Black*, 733 F.3d 294 (9th Cir. 2013);

21   *United States v. Russell*, 411 U.S. 423 (1973)).

22         D.    "[D]ismissal under this 'extremely high' standard is appropriate only in

23   'extreme cases in which the government's conduct violates fundamental fairness.'"Transcript at

24   9:17-21 (*quoting U.S. v Pedrin*, 797 F.3d 792 (9th Cir. 2015); *United States v. Smith*, 924 F.2d

25   889 (9th Cir. 1991)).

26         E.    "So, when reviewing a claim alleging that the Indictment should be

27   dismissed because the government's conduct was outrageous, evidence is viewed in the light

28   . . .

31

1  most favorable to the government." Transcript at 9:22 to 10:01 (*citing United States v. Gurolla*,

2  333 F.3d 944 (9th Cir. 2003)).

3          F.      "The concept of outrageous government conduct focuses on the

4  government's actions." Transcript at 10:02–3 *(citing United States v. Restrepo*, 930 F.2d 705

5  (1991)).

6          G.      "Here in this case, both the prosecution and the investigative agencies are

7  equally responsible for the failure to produce *Brady* materials to the defense." Transcript at

8  10:04-06.

9          H.      The Court finds the prosecution's representations that it was unaware of

10 the materiality of the Brady evidence is grossly shocking." Transcript at 10:13-15.

11         I.      "[T]he government was well aware that theories of self-defense,

12 provocation and intimidation might become relevant if the defense could provide a sufficient

13 offer of proof to the Court.  However, the prosecution denied the defense its opportunity to

14 provide favorable evidence to support their theories as a result of the government's withholding

15 of evidence and this amounts to a *Brady* violation." Transcript at 10:22 to 11:11.

16         J.      "[T]he prosecutor has a duty to learn of favorable evidence known to

17 other government agents, including the police, if those persons were involved in the

18 investigation or prosecution of the case." Transcript at 11:07–11 (*citing Kyles v. Whitley*, 514

19 U.S. 419 (1995).

20         K.      "Clearly, the FBI was involved in the prosecution of this case." Transcript

21 at 11:12.

22         L.      "Based on the prosecution's failure to look for evidence outside of that

23 provided by the FBI and the FBI's failure to provide evidence that is potentially exculpatory to

24 the prosecution for discovery purposes, the Court finds that a universal sense of justice has been

25 violated." Transcript at 11:13–17.

26         M.      Alternatively, a district court may exercise its supervisory powers in three

27 different enumerated ways:  Number one, 'to remedy unconstitutional or statutory violation[s]';

28 number two, 'to protect judicial integrity by ensuring that a conviction rests on appropriate

32

1  considerations validly before a jury'; or number three, 'to deter future illegal conduct."

2  Transcript at 11:24 to 12:06 (quoting *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1991)).

3          N.      "In *United States vs. W.R. Grace*," 504 F.3d 745 (9th Cir. 2007) "the

4  Ninth Circuit clarified that the exercise of the Court's inherent powers is not limited to these

5  three grounds enumerated in *Simpson* ...." Transcript at 11:24 to 12:07-10.

6          O.      "'Dismissal is appropriate when the investigatory or prosecutorial process

7  has violated a federal Constitution or statutory right and no lesser remedial action is available.'"

8  Transcript at 12:11-14 (*quoting U.S. v. Barrera-Moreno*, 951 F.2d 1089 (9th Cir. 1991)).

9          P.      "The Ninth Circuit has recognized that exercise of a supervisory power is

10  an appropriate means of policing ethical misconduct by prosecutors." Transcript at 11:15-18

11  (*citing U.S. v. Lopez*, 4 F.3d 1455 (9th Cir. 1993)).

12          Q.      "So 'dismissal under the Court's supervisory powers for prosecutorial

13  misconduct requires both: 'Number one, flagrant misbehavior, and number two, substantial

14  prejudice.'" Transcript at 12:19-23 (*quoting United States v. Kearns*, 5 F.3d 1251 (9th Cir.

15  1993)).

16          R.      "Neither accidental nor mere negligent governmental conduct is

17  sufficient.  The idea of prejudice entails that the government's conduct had at least some impact

18  on the verdict and thus rounded to the defendant's prejudice." Transcript at 12:24 to 13:02.

19          S.      "In Order for the Court to dismiss an Indictment under the supervisory

20  powers, the Court must find that there has been flagrant prosecutorial misconduct, substantial

21  prejudice to the defendants, and that no lesser remedial action is available." Transcript at 13:03-

22  06.

23          T.      "So the Court looks to *Chapman, U.S. v. Chapman*." [524 F.3d 1073 (9th

24  Cir. 2008)] ... The district court in *Chapman* found that the 'Assistant U.S. Attorney acted

25  flagrantly, willfully and in bad faith' and that he had made 'affirmative misrepresentations to the

26  Court,' and that the defendants would be prejudiced by a new trial and that no lesser standard

27  would adequately remedy the harm done after reviewing the totality of the proceedings before

28  it." Transcript at 14:8, 14:12-18.

1  U.  "The Ninth Circuit held that the *Chapman* court did not abuse its
2  discretion by dismissing the Indictment pursuant to its supervisory powers." Transcript at 14:10-
3  21.

4  V.  "'The prosecutor has a 'sworn duty' to assure that the defendant has a fair
5  and impartial trial.  His interest in a particular case is not necessarily to win, but to do justice.'"
6  Transcript at 15:14-17 (*quoting U.S. v. Chapman*." 524 F.3d 1073 (9th Cir. 2008)).

7  W.  "[T]he fact that the prosecution failed to look beyond the files provided
8  by the FBI is not mere negligence; it is a reckless disregard for its Constitution[al] obligations to
9  learn and seek out favorable evidence.  The prosecution's reliance on the FBI to provide the
10  required information *amounted to an intentional abdication of its responsibility*." Transcript at
11  16:11-16 (Emphasis Added).

12  X.  "Thus, the Court does find that there has been flagrant prosecutorial
13  misconduct in this case ...." Transcript at 19:09-10.[6]

14  Y.  "The Court is troubled by the prosecution's failure to look beyond the
15  FBI file that was provided and construes the Brady violations in concert as a reckless disregard
16  of its discovery obligations.  The government's recklessness and the prejudice the defendants
17  will suffer as a result of a retrial warrant the extreme measure of dismissing the Indictment
18  because no lesser sanction would adequately ... deter future investigatory and prosecutorial
19  misconduct." Transcript at 20:14-21.

20  Z.  "[The government's] conduct has caused the integrity of a future trial and
21  any resulting conviction to be even more questionable.  Both the defense and the community
22  possess the right to expect a fair process with a reliable conclusion.  Therefore, it is the Court's
23  position that none of the alternative sanctions available are as certain to impress the government
24  . . .

25  _____

26  [6]  With regard to the prejudice resulting from the government's recent production of
BLM Officer Wooten's Whistleblower Complaint, Judge Navarro was troubled by his "abrupt
27  removal ... in February 2017, allegedly by the prosecution because he complained of Special
Agent in Charge Dan Love's misconduct, the investigating law enforcement officer's bias, the
28  government's bias, and the failure to disclose exculpatory evidence." Transcript at 19:23 to
20:05.

1  with the Court's resoluteness in holding prosecutors and their investigative agencies to the

2  ethical standards which regulate the legal profession as a whole." Transcript at 20:23 to 21:07.

3          AA.    "***The Court finds that the government's conduct in this case was indeed***

4  ***outrageous, amounting to a due process violation***, and that a new trial is not an adequate

5  sanction for this due process violation." Transcript at 21:08-11 (Emphasis Added).

6          BB.    "Even if the government's conduct did not rise to the level of a due

7  process violation, the Court would nonetheless dismiss under its supervisory powers because

8  there has been flagrant misconduct, substantial prejudice, and no lesser remedy is sufficient ...

9  Number one, to properly remedy the constitutional violation; number two, to protect judicial

10  integrity by ensuring that a conviction rests only on appropriate considerations validly before a

11  jury; and number three, to deter future illegal conduct." Transcript at 21:12-16, 21:20-24.

12          127.    On the heels of the GOVERNMENT ***EMPLOYEES'*** conspiracy being exposed

13  and the lead case of the consolidated matter being dismissed, the UNITED STATES, on

14  February 7, 2019 voluntarily moved to dismiss, with prejudice, their fabricated criminal charges

15  against the Tier 2 Plaintiffs – false charges which directly, proximately and foreseeably caused,

16  among other things: (a) the false arrest of each Tier 2 Plaintiff; (b) the wrongful denial of bail;

17  (c) the unlawful detainment, imprisonment and monitoring of each Tier 2 Plaintiff for twenty-

18  three (23) months; (d) the egregious separation of the Tier 2 Plaintiffs from their friends, family

19  and loved ones, including, without the Bundy Family Plaintiffs, and the ongoing stress and

20  mental, physical and emotional anguish which PLAINTIFFS continue to experience; (e) the

21  corresponding loss of consortium wrongfully forced on PLAINTIFFS (f) the inability for

22  PLAINTIFFS to freely practice their faith and attend weekly family worship services / other

23  church events – tenants of the LDS faith; (g) financial, occupational and reputational harm as a

24  result of the GOVERNMENT ***EMPLOYEES'*** egregious branding and characterization of

25  PLAINTIFFS in the media as "domestic terrorists;" (h) the loss of gainful employment,

26  including, without limitation, future impairment for PLAINTIFFS' chosen professions;

27  (I) harassment and embarrassment resulting from the GOVERNMENT ***EMPLOYEES'***

28  placement and continued maintenance of PLAINTIFFS on the "No Fly List" which results in

1  improper detainment, interrogation, delays and other travel restrictions when they attempt to fly

2  commercially; and (j) interference with PLAINTIFFS' right to lawfully acquire and bear arms

3  due to the GOVERNMENT **EMPLOYEES'** placement of PLAINTIFFS on secret lists which

4  disqualifies and precludes them from purchasing firearms.

5  **The UNITED STATES' Constitutional & Statutory Violations**

6      128.    PLAINTIFFS fully incorporate herein by this reference all allegations contained

7  in paragraphs 1 through **127** of this Complaint.

8      129.    As a direct, proximate and foreseeable cause of the GOVERNMENT

9  **EMPLOYEES'** conspiracy (one that involved multiple egregious acts performed by **these duly**

10  **authorized representatives** in their official capacity; that is, within the scope and course of their

11  employment of their respective federal agencies, and performed in furtherance of that

12  conspiracy), along with other independent, unprivileged acts performed by **AUSA's** Ahmed,

13  Myhre **and** Bogden, **BLM SAC** Love, **Officers** Stover **and** Brunk, and **Agent** Willis,

14  PLAINTIFFS' rights were knowingly, intentionally and willfully violated, infringed and

15  impaired, including, without limitation:

16          A.    The Tier 2 Plaintiffs' right to assemble together, exercise free speech and

17  lawfully protest against the UNITED STATES egregious conduct and its wrongful curtailment

18  of their rights by the GOVERNMENT **EMPLOYEES** in contravention of the First Amendment

19  to the United States Constitution; Article 1, Sections 1 (Inalienable Rights), 9 (Liberty of

20  Speech) and 10 (Right to Assemble & Petition) of the Nevada Constitution; and Nevada

21  Revised Statute ("NRS") 41.637's protection of good faith communications in furtherance of

22  PLAINTIFFS' right to petition or the right to free speech in direct connection with an issue of

23  public concern, including any "[c]ommunication made in direct connection with an issue of

24  public interest in a place open to the public or in a public forum."

25          B.    PLAINTIFFS' right to lawfully purchase, keep and bear arms as provided

26  for in the Second Amendment to the United States Constitution; Article 1, Section 11 (Right to

27  Keep & Bear Arms; Civil Power Supreme) of the Nevada Constitution; and NRS 244.364 which

28  vests control over the regulation of, and policies concerning, firearms, firearm accessories and

1  ammunition with the Nevada State Legislature, including, without limitation, the regulation of

2  transfers, sales and purchases of same;

3         C.    The GOVERNMENT *EMPLOYEES'* fabricated indictments, unlawful

4  arrests, rogue detainments, preclusion of bail, false imprisonment and malicious prosecution of

5  the Tier 2 Plaintiffs (i.e., without probable cause or due process of law) deprived the Tier 2

6  Plaintiffs of their life, liberty and property rights, and constituted cruel and unusual punishment

7  in contravention of the Fourth, Fifth and Eighth Amendments to the United States Constitution;

8  Article 1, Section 1 (Inalienable Rights), Section 6 (Excessive Bail & Fines), Section 8 (Rights

9  of Accused in Criminal Prosecutions) and Section 18 (Unreasonable Seizure & Search; Issuance

10  of Warrants) of the Nevada Constitution; NRS 199.310 (Malicious Prosecution) and NRS

11  200.460 (False Imprisonment).

12         D.    The GOVERNMENT *EMPLOYEES'* abhorrent and outrageous conduct

13  – conduct which irrefutably shocks the conscious – egregiously deprived the Tier 2 Plaintiffs of

14  their life, liberty and property rights in contravention of substantive and procedural due process

15  rights; rights guaranteed to them by the Fifth Amendment of the United States Constitution and

16  Article 1, Section 8 of the Nevada Constitution.

17         E.    The GOVERNMENT *EMPLOYEES'* egregious placement and

18  maintenance of PLAINTIFFS on the "Prohibited Persons List" for purchasing or otherwise

19  acquiring a weapon governed by the Gun Control Act, 18 U.S.C. 922(g) based upon fabricated

20  evidence and the GOVERNMENT *EMPLOYEES'* egregious branding and characterization of

21  them as "domestic terrorists" without notice or an opportunity to be heard also violates

22  PLAINTIFFS' substantive and procedural due process rights in violation of the Second

23  Amendment to the United States Constitution and Article 1, Section 11 (Right to Keep & Bear

24  Arms) of the Nevada Constitution.  Notably, the Prohibited Persons List only applies to persons:

25       •    Convicted in any court of a crime punishable by imprisonment for a term
         exceeding one year;

26

27       •    who is a fugitive from justice;

28       •    who is an unlawful user of or addicted to any controlled substance (as defined in
         section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 892);

1   • who has been adjudicated as a mental defective or has been committed to any
2      mental institution;

3   • who is an illegal alien;

4   • who has been discharged from the Armed Forces under dishonorable conditions;

5   • who has renounced his or her United States citizenship;

6   • who is subject to a court order restraining the person from harassing, stalking, or
      threatening an intimate partner or child of the intimate partner; or

7   • who has been convicted of a misdemeanor crime of domestic violence.

None of the aforementioned prohibitions, however, apply to PLAINTIFFS and, as such, the

GOVERNMENT *EMPLOYEES'* placement and continued maintenance of PLAINTIFFS on

this Prohibited Persons List is, and remains, unconstitutional.

G.      The GOVERNMENT *EMPLOYEES'* unlawful arrest, detainment and

incarceration of the Tier 2 Plaintiffs also precluded them from freely practicing their faith and

attending weekly family worship services / other church events – tenants of the LDS faith – in

violation of the First and Eighth Amendments to the United States Constitution, and

Article 1, Section 4 (Liberty of Conscience) and Section 6 (Cruel & Unusual Punishment) of the

Nevada Constitution.  Notably, throughout their incarceration, prison guards, at the direction of

the GOVERNMENT *EMPLOYEES*, interfered with and ridiculed the Tier 2 Plaintiffs'

LDS garments (undergarments worn under their clothes as a sacred symbol of their personal

commitment to God and their commitment to fidelity).

***Exhaustion of Administrative Remedies***

*130.    Pursuant to 28 U.S.C. § 1346(b), PLAINTIFFS timely and properly submitted*

*a Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies*

*(i.e., the Federal Bureau of Investigation, the Bureau of Land Management and the United*

*States Department of Justice on or about February 3, 2020), including, without limitation,*

*an administrative tort claim demand package to the U.S. Department of Justice, Civil*

*Division, Torts Branch, Federal Tort Claims Act section ("FTCA Section") which the U.S.*

*Department of Justice acknowledged had all been received by February 6, 2020.*

38

1    *131.    Since the FTCA Section did not act within six (6) months (i.e., <u>by August 5,</u>*
2    *<u>2019</u>), its failure to issue a decision is treated as a final decision, enabling Plaintiffs here to*
3    *proceed with their claims against the United States as of that date. See 28 U.S.C. § 2675(a).*

4    *132.    Plaintiffs, therefore, at the time of filing this pleading, have fully satisfied and*
5    *exhausted their administrative obligations to present their FTCA claims to the Court and, as*
6    *such, their FTCA Claims are properly before the Court, this Court possesses exclusive*
7    *subject matter jurisdiction over same, and they are ripe for adjudication.*

8
9                                    **FIRST CLAIM FOR RELIEF**
                          **(Federal Tort Claims Act Claims - 28 U.S.C. § 2671 *et seq.*)**

10                              (All PLAINTIFFS v. UNITED STATES)

11   133.    PLAINTIFFS fully incorporate herein by reference all allegations contained in
12   paragraphs 1 through *132* of this Complaint.

13   134.    Pursuant to 28 U.S.C. § 1346(b), "federal district courts have jurisdiction over a
14   certain category of claims for which the [UNITED STATES] has waived its sovereign immunity
15   and 'render[ed]' itself liable," including, without limitation, "'claims that are: [1] against the
16   United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or
17   death [4] caused by the negligent or wrongful act or omission of any employee of the
18   Government [5] while acting within the scope of his office or employment, [6] under
19   circumstances where the United States, if a private person, would be liable to the claimant in
20   accordance with the law of the place where the act or omission occurred.'" *F.D.I.C. v. Meyer*,
21   510 U.S. 471, 477 (1994) (quoting 28 U.S.C. § 1346(b)).

22   135.    "A claim comes within this jurisdictional grant – and thus is 'cognizable' under
23   § 1346(b) – if it is actionable under § 1346(b). And a claim is actionable under § 1346(b) if it
24   alleges the six elements outlined above." *Id.* (*citing Loeffler v. Frank*, 486 U.S. 549 (1988)

25   136.    The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.,* is the
26   exclusive remedy for tort actions against a Federal agency (28 U.S.C. § 2679(a)) and against
27   Federal employees who commit torts while acting within the scope and course of their
28   employment (28 U.S.C. § 2679(b)(1)).

1   137.   As set forth above, the GOVERNMENT *EMPLOYEES* engaged in certain
2   tortious acts in their official capacities.

3   138.   With regard to the GOVERNMENT *EMPLOYEES'* tortious conduct that was
4   performed while they were "acting within the scope of [their official] office[s] or employment at
5   the time of the incident out of which the [PLAINTIFFS'] claim[s] arose," the UNITED
6   STATES is solely liable for that conduct as mandated by 28 U.S.C. § 2679(d)(2)) and the
7   Federal Employees Liability Reform & Tort Compensation Act of 1988 ("Westfall Act").

8   139.   Similarly, PLAINTIFFS' exclusive remedy for their tort-based claims against the
9   GOVERNMENT *EMPLOYEES'* employers (i.e., the DOJ, DOI, BLM and FBI) is the UNITED
10   STATES (28 U.S.C. § 2679(a)).

11   140.   To that end, 28 U.S.C. § 2680(h) expressly provides that the UNITED STATES
12   is also liable for certain intentional torts that are based on the "acts or omissions" of an
13   "investigative or law enforcement officer" and include "[a]ny claim arising out of ... false
14   imprisonment, false arrest, [and] malicious prosecution ...." *Millbrook v. U.S.*, 569 U.S. 50, 52
15   (2013) (*citing* 28 U.S.C. § 2680(h); *see also Levin v. United States*, 568 U.S. 503 (2013)).

16   141.   Here, PLAINTIFFS have valid State-law tort claims arising out of, related to and
17   connected with the GOVERNMENT *EMPLOYEES'* tortious conduct that was performed in
18   their official capacity and during the scope and course of their employment with the DOJ, DOI /
19   BLM and FBI, including, without limitation, the following claims:

20           A.    False Arrest

21                   In Nevada, to establish false arrest, 'a plaintiff must show the defendant
22   instigated or effected an unlawful arrest." *Jones v. Las Vegas Metropolitan Police Dept.*, 2011
23   WL 13305450 at *3 (D.Nev. 2011) (*quoting Nau v. Sellman*, 757 P.2d 358, 260 (Nev. 1988)).
24   To that end, PLAINTIFFS affirmatively allege that the GOVERNMENT *EMPLOYEES*
25   fabricated evidence, suborned and provided perjurious testimony, and egregiously withheld and
26   destroyed exculpatory evidence so that they could erroneously secure Grand Jury Indictments
27   upon which the false arrest warrants were issued against the Tier 2 Plaintiffs.  PLAINTIFFS
28   further allege that, as a direct, proximate and foreseeable cause of the GOVERNMENT

1  ***EMPLOYEES'*** tortious acts related to the instigation or effectuation of the unlawful arrest of

2  the Tier 2 Plaintiffs (i.e., those acts performed in their official capacity, scope and employment

3  with the DOJ, DOI/BLM and FBI), the UNITED STATES is, and remains, liable therefor.

4          B.     False Imprisonment

5          In Nevada, "[f]alse imprisonment is an unlawful violation of the personal

6  liberty of another, and consists in confinement or detention without legal sufficient authority."

7  NRS 200.460. "To establish false imprisonment of which false arrest is an integral part, it is ...

8  necessary to prove that the person be restrained of his liberty under probable imminence of force

9  without any legal cause or justification." *Jones*, 2011 WL 13305450 at *3 (*quoting Hernandez*

10  *v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981). "Thus, 'an actor is subject to liability to

11  another for false imprisonment 'if (a) he acts intending to confine the other ... within the

12  boundaries fixed by the actor, and (b) his act directly or indirectly results in a confinement of the

13  other, and (c) the other is conscious of the confinement or is harmed by it.'" *Id.* (*quoting*

14  Restatement (Second) of Torts § 35 (1965)). PLAINTIFFS, here, affirmatively allege that the

15  Tier 2 Plaintiffs were unlawfully detained, imprisoned and in-custody by the UNITED STATES

16  for twenty-three (23) months, mostly at a sweltering federal-contractor prison in Pahrump,

17  Nevada. PLAINTIFFS further allege that, as a direct, proximate and foreseeable cause of those

18  tortious acts related to the Tier 2 Plaintiffs' incarceration (i.e., acts performed by the

19  GOVERNMENT ***EMPLOYEES*** in their official capacity, scope and employment with the DOJ,

20  DOI/BLM and FBI), those acts:  (a) were performed with the intention of confining the Tier 2

21  Plaintiffs to prison; (b) they directly or indirectly resulted in the Tier 2 Plaintiffs' confinement;

22  and (c) all PLAINTIFFS were conscious of that unlawful confinement.  As a result, the

23  UNITED STATES is, and remains, liable therefor.

24          C.     Malicious Prosecution

25          In Nevada, "[a] person who maliciously and without probable cause

26  therefor, causes or attempts to cause another person to be arrested or proceeded against for any

27  crime of which that person is innocent" is liable for malicious prosecution. NRS 199.310.  In

28  this regard, to state a claim for malicious prosecution under Nevada law, a Plaintiff must allege:

41

1  "(1) that the defendant lacked probable cause to initiate a prosecution; (2) malice; (3) the prior

2  criminal proceedings were terminated in his favor; and (4) Plaintiff suffered damages."

3  *Anderson v. United States*, 2019 WL 6357256 at *2 (D.Nev. 2019) *(quoting LaMantia v. Redisi*,

4  118 Nev. 27, 30, 38 P.3d 877, 879 (Nev. 2002)).  PLAINTIFFS here affirmatively allege that,

5  the GOVERNMENT **EMPLOYEES'** fabrication of evidence, elicitation and providing of

6  perjurious testimony, along with the egregious withholding and destruction of exculpatory

7  evidence so that they could wrongfully secure Grand Jury Indictments and arrest warrants

8  against the Tier 2 Plaintiffs establishes the absence of probable cause, along with the malicious

9  intent of said **GOVERNMENT EMPLOYEES'** conduct.  PLAINTIFFS further allege that the

10  UNITED STATES' dismissal, with prejudice, of all charges against the Tier 2 Plaintiffs

11  unequivocally establishes that the Underlying Action was terminated in the Tier 2 Plaintiffs'

12  favor.  Moreover, as detailed below, PLAINTIFFS sustained damages as a direct, proximate and

13  foreseeable cause of the aforementioned tortious conduct.

14          D.    Intentional Infliction of Emotional Distress

15          In *Sheehan v. U.S.*, 896 F.2d 1168, 1172 (9th Cir. 1990), the Ninth

16  Circuit Court of Appeals expressly recognized the appropriateness of an intentional infliction of

17  emotional distress claim in FTCA actions.  To that end, in Nevada, "[t]he elements of a cause of

18  action for intentional infliction of emotional distress are '(1) extreme and outrageous conduct

19  with either the intention of, or reckless disregard for, causing emotional distress, (2) the

20  plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate

21  causation.'" *Dillard Dept. Stores, Inc. v. Beckwith*, 115 Nev. 372, 378, 989 P.2d 882, 886 (Nev.

22  1999).  PLAINTIFFS here affirmatively allege that the GOVERNMENT **EMPLOYEES'**

23  conduct (i.e., for those acts performed in their official capacity, scope and employment with the

24  DOJ, DOI/BLM and FBI) was: (1) extreme and outrageous and accomplished with the intent, or

25  reckless disregard for, causing PLAINTIFFS' emotional distress; (2) the PLAINTIFFS, in fact,

26  have suffered, and continue to suffer from, severe and extreme emotional distress; which

27  (3) was actually or proximately caused.  As a result, the UNITED STATES is, and remains,

28  liable for PLAINTIFFS' damages (discussed below).

1         E.    Loss of Consortium

2         "Nevada law recognizes that '[a]n action for loss of consortium is

3    derivative of the primary harm to the physically injured spouse (parent)).'" *Fakoya v. County of*

4    *Clark*, 2014 WL 5020592 at \*9 (D.Nev. 2014) (*citing Gen. Motors Corp. v. Eighth Judicial*

5    *Dist. Court of State of Nev. ex rel. Cnty. of Clark*, 122 Nev. 466, 134 P.3d 111 (Nev. 2006).

6    Here, PLAINTIFFS affirmatively allege that as a direct, proximate and foreseeable cause of the

7    GOVERNMENT ***EMPLOYEES***' tortious conduct, including, without limitation, the physical

8    injuries sustained by Tier 2 Plaintiffs Dave Bundy and Mel Bundy, the Bundy Family Plaintiffs

9    have validly stated claims for relief against the UNITED STATES for those acts, performed by

10   the GOVERNMENT ***EMPLOYEES*** in their official capacity, within the scope and course of

11   their employment.  Notably, PLAINTIFFS affirmatively allege that, as a direct, proximate and

12   foreseeable cause the aforementioned injuries:

13        1.    Plaintiff Marylynn Bundy, the wife of Tier 2 Plaintiff Dave

14   Bundy, lost the love, affection, protection, support, services, companionship, care, society and

15   sexual relations of her husband, all of which warrant an award of damages.

16        2.    Plaintiffs Brett Roy Bundy, Maysa Lynn Bundy, Dally Anne

17   Bundy, Bronco Cliven Bundy, Payton Alma Bundy and Piper Bodel Bundy also lost the love,

18   affection, protection, support, care, society and parental guidance of their father, Dave Bundy,

19   all of which warrant an award of damages.

20        3.    Plaintiff Briana Bundy, the wife of Tier 2 Plaintiff Mel Bundy,

21   lost the love, affection, protection, support, services, companionship, care, society and sexual

22   relations of her husband, all of which warrant an award of damages.

23        4.    Plaintiffs Montana Bundy, Bentlie Bundy, Presly Bundy, Kymber

24   Bundy and Adahlen Bundy also lost the love, affection, protection, support, care, society and

25   parental guidance of their father, Mel Bundy, all of which warrant an award of damages.

26       142.    PLAINTIFFS further allege that as a direct, proximate and foreseeable cause of

27   certain GOVERNMENT ***EMPLOYEES'*** official capacity conduct performed in the scope and

28   course of their employment with the DOJ, DOI / BLM and FBI, Plaintiffs Marylynn Bundy and

1  Briana Bundy suffered severe emotional, physical, mental, occupational and financial distress –

2  damages and injuries which continue to this day.

3      143.    Pursuant to 28 U.S.C. § 1346(b), PLAINTIFFS timely and properly submitted a

4  Claim for Damage, Injury or Death to the UNITED STATES and its requisite agencies*; more*

5  *than six (6) months have elapsed since the United States Department of Justice acknowledged*

6  *its receipt of that demand package, rendering said claims denied pursuant to 28 U.S.C.*

7  *§ 2675(a);* and, as such, *at the time of filing this pleading, PLAINTIFFS* have fully satisfied

8  and exhausted their administrative obligations to present their FTCA claims to the Court.

9      WHEREFORE, PLAINTIFFS are entitled to judgment against the Defendant *the*

10  *UNITED STATES* for the following relief:

11      A.    Monetary damages in an amount to be proven at trial;

12      B.    Attorneys' fees and costs;

13      C.    Pre-judgment and post-judgment interest pursuant to law;

14      D.    For hedonic damages in favor of the Tier 2 Plaintiffs for the impairment to their

15  future employment opportunities;

16      E.    Compensatory damages arising out of, related to or connected with the

17  reputational harm of being branded "domestic terrorists;"

18      F.    All such other and further relief as the Court may deem just and equitable,

19  including, without limitation, post-judgment attorneys' fees and costs.

20

21      RESPECTFULLY SUBMITTED this ___ day of _____, 2022.

22  

23  Marquiz Law Office
    Professional Corporation

24  

25  By: /s/ Craig A. Marquiz, Esq.
    Craig A. Marquiz, Esq.
    3088 Via Flaminia Court

26      Henderson, NV 89052
    Counsel for Plaintiffs

27  

28